## STATE *v.* ARMSTRONG.

[73 Pac. 1022.]

|  |  |
|---|---|
| 43 | 207 |
| s45 | 25 |
| s45 | 26 |
| 43 | 207 |
| f46 | 348 |
| d46 | 489 |
| f47 | 488 |
| 43 | 207 |
| f48 | 174 |

CHANGE OF VENUE — ABUSE OF DISCRETION.

1. The determination of an application for a change of venue is a matter for the exercise of discretion by the trial court, and its decision will not be reversed unless it appears that an injustice has resulted. In the present instance it is clear that the refusal to change the place of trial was not error.

COMPETENCY OF JUROR — DISCRETION.

2. On a challenge of a juror for actual bias the determination of his competency is largely discretionary with the trial judge, reviewable for abuse.

COMPETENCY OF JURORS — PRECONCEIVED OPINION — BIAS.

3. Where the opinions of jurors in a criminal case were based on mere hearsay statements, none of the jurors having talked with any person assuming to give the facts of his own knowledge, and the jurors asserted that their opinions formed were not such as they would be willing to act on at the present time, and that they considered themselves competent to try the case on the testimony, the denial of a challenge for actual bias was not error, though the jurors stated that it would require strong evidence to remove their opinions.

ERROR MADE HARMLESS BY SUBSEQUENT CONDUCT.

4. Error, if any, in sustaining an objection to a question asked of a juror as to whether any prejudice existed in his mind against the defendant was rendered harmless where almost the identical question was subsequently asked, and answered in the negative, without objection.

REDUCING INSTRUCTIONS TO WRITING — TECHNICAL ERROR.

5. In Oregon the rule requiring a trial judge to reduce his charge to writing, if requested to do so, and to file it with the clerk (B. & C. Comp. § 132, subd. 6), which

is generally held to be mandatory, is modified by Section 1484, B. & C. Comp., providing that the supreme court shall give judgment without regard to technical errors which do not affect the substantial rights of the parties, so that the failure of a trial judge to write out certain passages from a printed book will not require a reversal, where the extracts were read without comment, and were substantially the same as the written instructions. The failure of the judge to write down the entire charge and file it was a technical but not a material error, it being manifest that the passages read did not modify or change the written charge.

Proceedings Before Trial — Place of Confinement.

6. Where during defendant's incarceration for homicide before his trial threats of lynching were made, an order directing defendant's removal to another place of confinement for his protection was not an error of which he could complain.

From Baker: Robert Eakin, Judge.

Pleasant Armstrong appeals from a judgment of death following a conviction of murder.          Affirmed.

For appellant there was a brief and an oral argument by *Mr. M. M. Godman* and *Mr. Geo. J. Bentley.*

For respondent there was a brief over the names of *Samuel White,* District Attorney, and *A. B. Winfree,* with an oral argument by *Mr. Andrew M. Crawford,* Attorney-General, and *Mr. White.*

Mr. Justice Wolverton delivered the opinion.

The defendant appeals from a judgment of the circuit court, rendered upon a verdict convicting him of murder in the first degree. There are three principal assignments of error touching the rulings of the trial court, namely, in refusing to grant a change of venue, in disallowing defendant's challenge for cause to certain jurors, and in orally commenting upon and explaining certain instructions given in writing at the request of the defendant. Other assignments are noted, but are not especially insisted upon, and need but casual examination.

1. The crime of which defendant was convicted was committed December 25, 1902. Upon being arrested soon after, he was confined in the county jail at Baker City until about the second of March, 1903, when he was removed therefrom in anticipation of a raid about to be made upon

the jail by a body of men with the evident purpose of taking him therefrom and lynching him. The removal was in pursuance of an order of the judge of the circuit court, made upon the motion of the district attorney, and the defendant was confined at Portland until the twentieth of March, when he was returned to Baker City for trial. Thereupon the defendant, by his counsel, moved for a change of venue to Umatilla County on account of the prejudice existing against him in the Eighth Judicial District. The motion is based upon the affidavits of defendant, his counsel, and others, showing that deceased was a teacher in the public schools, and well and favorably known throughout Baker County; that the people and citizens of all parts of the county had become much incited and incensed against defendant on account of the alleged offense, and had made numerous threats against his life; that on the night of March 2, 1903, a body of from one hundred to one hundred and fifty armed and masked men gathered at the county jail, with the avowed purpose of lynching the defendant, and demanded his person in the name of the taxpayers; that there existed a strong prejudice in the minds of the people of Baker, Union, and Wallowa counties, engendered by sensational and inflammatory articles printed in the local newspapers and elsewhere; that it was deemed unsafe to proceed with the trial in Baker County, because, as defendant was informed and believed, should any other verdict than murder in the first degree be rendered, the citizens of the county, in pursuance of their threats, would hang him, or he would be shot in the courtroom; and that a jury free from prejudice against the defendant, before whom he could expect to secure a fair and impartial trial, could not be obtained in the county. It was further shown that threats had been made against one of the attorneys for

defendant, to the effect that, unless defendant was speedily tried and convicted, he (the attorney) would be summarily dealt with, and, by the affidavits of persons from different localities of the county, that a deep-seated prejudice existed in their respective localities and throughout the whole county against the defendant. A copy of but one of the newspaper articles alluded to was appended to and made a part of the affidavits. This purports to detail the facts and circumstances attending the attempted lynching. Among other things, it is related that the original nucleus of the mob came from North Powder and vicinity, and arrived at Baker City in small parties, at different times during the day and evening, consisting in all of from sixty to seventy-five men, being for the most part miners, ranchers, and railroad men, who were acquainted with the family of the murdered girl; that the mob was augmented to something like two hundred persons from the usual crowd of patrons of the all-night places; that the attempt of the North Powder people to take the law into their own hands was probably suggested by the action of the court in postponing the trial until March 23, and that the bitter feeling on the part of the neighbors of the murdered girl was greatly intensified by the report that counsel for Armstrong would try to create sympathy for him at the trial by attempting to prove a mutual understanding between Armstrong and Miss Ensminger to commit suicide together because of parental opposition to their marriage.

The state filed in refutation of the above proofs the affidavits of numerous citizens of the county, all deposing to the effect that they had long been residents of the county ; that they had frequently conversed with citizens from all sections thereof, and were familiar with the feelings and sentiment of the people toward the defendant, and that whatever prejudice or bias there might exist against him in Baker County was confined to the imme-

diate locality of the tragedy, and to the family of the deceased and their immediate friends and acquaintances; that Baker County is large and populous, and divided by mountain ranges into small and diverse neighborhoods, which have but little intercourse one with the other; and that in the opinion of the affiants a fair and impartial jury, without prejudice against the defendant, could be obtained within the county. Upon this showing the court overruled the motion for a change of venue, and required the defendant to go to trial, of which he complains.

It is a fundamental principle that the accused in cases of felony is entitled to a trial by an impartial jury, and, if it cannot be had in the county where the offense was committed, the statute accords him a change of venue, so that he may have such a hearing as the constitution guarantees. It is self evident that an impartial trial cannot be had where an unprejudiced jury cannot be found, and, if the conditions are such that the entire people of the county, or a large proportion of them, are so excited and incensed against the accused that the selection of a jury free from such influences and bias could not be reasonably expected therein, then the accused should have the benefit of a change of venue, as otherwise there would be a clear disregard of his constitutional right. Such conditions, if they exist, may be made to appear by affidavit,* which mode was appropriately adopted in the case at bar. It is settled law in this state, and elsewhere under similar statutes, that the allowance of a change of venue is largely, if not exclusively, a matter for the exercise of the sound discretion of the trial court. This discretion, however, is judicial in its character, and is subject to be reviewed for an abuse thereof, where palpable injustice has been done: *State* v. *Pomeroy*, 30 Or. 16, 19 (46 Pac. 797); *State* v. *Sav-*

*Note—See Section 1250, B. & C. Comp.—REPORTER.

*age*, 36 Or. 191 (60 Pac. 610, 61 Pac. 1128); *State* v. *Humphreys*, 43 Or. 44 (70 Pac. 824). It is admitted there was an attempt to lynch the defendant, which is sufficient in itself to show the existence of a bad state of feeling against him within the county; but, if the newspaper report made a part of the showing is to be credited, the nucleus of the mob (and it can be designated by no better or more appropriate term, because it was an unlawful and intolerable assembly, purposing to override the laws intended for good government) originated in the vicinity where the tragedy was enacted, and was augmented by a class that usually patronizes the all-night resorts supposedly in and about Baker City, the place of trial. This does not show a general uprising of the people throughout the county, incensed by the commission of the crime, but rather that it was confined to residents of the immediate vicinity where it was committed, and others from the local haunts referred to; so that the body of the county in general was not shown thereby to be infected by ill will or prejudice against the defendant. True, it is asserted by the affidavits that such prejudice did exist among the people throughout the county to such an extent that the defendant could not expect a fair and impartial trial by a jury selected therefrom, but this is refuted by many affidavits on the part of the state, showing that in the opinion of the affiants a fair and impartial jury, free from bias or prejudice, could readily be obtained. It is further asserted that the alleged prejudice is the result of sensational and inflammatory articles published in the local newspapers at Baker City and elsewhere. But none of these articles are set forth, either by copy or exhibit, except the one giving an account of the attempted lynching, which appears to be a calm and dispassionate narrative of the facts pertaining thereto, published as a matter of news, without any attempt to stir up prejudice or manufacture public

opinion, either for or against the accused. There was apparently no effort or design, even inferentially, to prejudice the cause of the defendant, or to declare what should be his fate, or to indicate to the public or those who might be called upon to dispense justice what their verdict should be in the premises. Some threats, it appears, had been made to deal with the defendant summarily if he was not convicted of murder in the first degree, and to visit punishment upon one of his counsel unless a speedy trial was had and conviction ensued. But the source of these threats was not disclosed, and it is not shown that they were the promptings of public sentiment existing within the county against the accused, so that it would probably affect or vitiate the minds of any jury that might be obtained therein. These circumstances, together with the fact that a jury was obtained from a part of the regular panel and a special venire of forty men, lead us to conclude that the trial court was not in error in refusing to allow a change of venue to another county. The ruling was clearly not attended by an abuse of the sound and judicial discretion reposed in the trial courts, and should therefore be sustained.

2. The next assignment of error relates to the ruling of the court disallowing defendant's challenges for actual bias taken to the jurors Wyatt, Perry, Knoblauch, Underwood, and Wilson. We will not stop to inquire whether defendant is in a position to raise this question, but will assume that he is, and consider the matter upon its merits. There is a similarity in the examination of all these jurors on their *voir dire,* and we will only indicate the general character of their testimony, without noticing it in detail. They were all from points outside of Baker City, the place of trial, and away from the scene of the homicide. They had read accounts of the tragedy in the newspapers of their county and others from abroad, had discussed the affair

more or less with their families and neighbors, and had formed and expressed opinions based upon such accounts and from what they had heard other persons relate touching it; but none of them had talked with any witness in the case, that he was aware of, or any person assuming to give the facts from his own knowledge, and all information acquired was entirely from hearsay. Some of these jurors, on their examination in chief, indicated that they would go into the jury box with the opinions they had formed, and that it would take evidence, sworn testimony, to remove the same; one of them saying that he hardly thought he would start in the case with his mind entirely free and unbiased; another that it would require a good deal of evidence to remove the opinion he had; and another that it would require "pretty solid testimony" to remove it. One of them signified that his opinion was fixed until removed, but all of them, either by further elucidation in the examination in chief or by cross-examination in answer to questions propounded by the court, expressed a conscientious belief that they could go into the jury box without any bias or prejudice against the defendant, disregard their respective opinions theretofore formed or expressed, and hear and decide the case alone upon the testimony and the law given them at the trial. Most, if not all, of them asserted that the opinion formed was not such as they would be willing to act upon at the present time.

By our statute, upon the trial of a challenge for actual bias, the opinion of the juror, formed or expressed upon the merits of the cause, derived from what he has read or heard, is not in itself sufficient to justify the allowance of such a challenge.* The statute referred to has been construed by this court so many times that it has now become well understood. If the trial court is satisfied, from an

---

*NOTE.—See Section 123, B. & C. Comp.—REPORTER.

appropriate examination of the juror, that he can conscientiously disregard such an opinion, and hear and determine the case impartially upon the facts and the law as given at the trial, the challenge may be properly denied. Safeguarded by a careful scrutiny of the trial courts to determine that the juror is without bias or prejudice as a trier of the cause, the statute is not inimical to the constitutional right of the accused to a trial by an impartial jury. It recognizes the idea, patent to every one, that men of intelligence will think upon matters of general information, though obtained through the ordinary avenues by which common intelligence is dispensed, and will very naturally arrive at some conclusion or opinion relative thereto, and, being of social instincts, will discuss such matters in their intercourse with their fellow men, and express the opinions thus formulated. It also very properly accredits intelligence with the powers of discrimination and right reasoning, uninfluenced by preconceived notions and vague opinions formed upon insufficient knowledge; and that men of honest impulses, controlled by an innate sense of justice, will be able to lay aside and disregard impressions and opinions of this character, and to determine causes upon sworn testimony alone, governed by the rules of law applicable thereto as given by the court. It is but reasonable to believe that upright and conscientious jurors can and will thus deport themselves when called upon to administer justice. Were it otherwise, the jury system would cease in a great measure to be the palladium of civil rights, and in many cases, in the present time of rapid and wide dissemination of the accounts of important and extraordinary events, it would be almost impossible even to secure twelve men of a community or county eligible as jurors in the trial of a cause. There would at least be an elimination of those who read and inform themselves, and a relegating of the administration

of justice to a class of citizens not the more intelligent, contrary to the spirit of the jury system, and the constitution and laws of the state. Where, therefore, the information acquired upon which the opinion is formed and expressed is hearsay in character, and does not emanate from a source purporting to speak to a personal knowledge of the facts, it does not alone disqualify the juror. The determination, consequently, of a juror's competency is necessarily and primarily a question for the trial court, which should ever keep in mind the ultimate object to be attained, namely, a trial by a fair and impartial jury; it being, as above indicated, a matter largely for the exercise of a sound discretion, and the findings of the trial court upon a challenge for actual bias are not the subject for review unless there has been an abuse of such discretion, or it has been arbitrarily exercised to the injury of the litigant: *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441); *Kumli* v. *Southern Pac. Co.* 21 Or. 505 (28 Pac. 637); *State* v. *Ingram,* 23 Or. 434 (31 Pac. 1049); *State* v. *Brown,* 28 Or. 147 (41 Pac. 1042); *State* v. *Kelly,* 28 Or. 225 (42 Pac. 217, 52 Am. St. Rep. 777); *State* v. *Olberman,* 33 Or. 556 (55 Pac. 866); *State* v. *Savage,* 36 Or. 191, 202 (60 Pac. 610, 61 Pac. 1128); *State* v. *McDaniel,* 39 Or. 161 (65 Pac. 520).

3. Measured by this enunciation of the law and these authorities, it is quite clear that the jurors challenged in the present case were, under the findings of the trial court, not disqualified to sit in the cause. None of them had a fixed and settled opinion, nor had they such an opinion as to the guilt or innocence of the accused that they could not disregard upon the trial, and a verdict render according to the sworn testimony there adduced and the law as given them by the court. The expression of one of the jurors that it would require a good deal of evidence to overcome the opinion he had formed, and of another that it would have to be "pretty solid testimony," must be read

in the light of the examination then being prosecuted by the defendant's attorney, which was calculated to lead them to such an assertion; but, when their attention was called to the principle that their verdict must be based alone upon the testimony adduced at the trial, they signified a conscientious and honest belief that they could disregard such opinion, and the trial court was impressed that they could, and, finding no bias or prejudice against the defendant, disallowed the challenge. We can find no reason under the law for disturbing the findings, and hence there was no error in denying any of the challenges interposed.

4. During the course of the examination the juror Wilson was asked on his *voir dire*, in effect, whether, from what he had read and heard, and the opinion he entertained of the matter, there existed any prejudice in his mind against the defendant. To this an objection was made by counsel for the state, which was sustained, and an exception saved, and error is predicated thereon. The answer to this is to be found in the fact that defendant's counsel subsequently propounded almost the identical question, which the juror answered, without objection. Counsel further inquired of the juror directly whether he had any bias or prejudice in the case one way or the other, to which he answered in the negative. Therefore the error, if any was committed in the premises, was cured.

5. The next assignment of error pertains to the manner of the court's instructing the jury. In compliance with the defendant's request the instructions were given in writing, but after the jury had been out some time, they returned, and the foreman announced that one of the jurors wanted further instruction on a point of law, namely, as to what constitutes a reasonable doubt, whereupon the court said: "The instruction I gave you on the question of reasonable doubt is taken largely from expressions of our own supreme court, and I have one of them before

me in which this question was one of the principal questions relied upon in the case, and I find the language of the legal opinion is almost the exact language I have read to you, although I have some additional items in my list, which I have taken from other decisions of the supreme court. I will reread this to you;" and reread the instruction as follows:

"It devolves upon the state in this action to establish the guilt of the defendant to your satisfaction beyond a reasonable doubt. And I instruct you that such a reasonable doubt arises when the evidence has not established the guilt of the defendant to your entire satisfaction. This doubt must be a reasonable doubt arising from a fair view and reasonable consideration of all the evidence. A reasonable doubt must be such a doubt existing in the mind as, in his own affairs, would cause a reasonably prudent or careful man to pause or hesitate to act in grave or important affairs of life. It must be a doubt for which a good reason exists, arising out of the testimony or the want of testimony. A reasonable doubt is not a mere possible doubt. It is that state of the case which, after an entire comparison and consideration of all the evidence, leaves your mind in such a condition that you cannot say that you feel an abiding conviction to a moral certainty of the truth of the charge. The law does not require a demonstration — that is, such a degree of proof as, excluding the possibility of error, produces absolute certainty— because such proof is rarely possible. Moral certainty only is required, or that degree of proof which produces conviction in an unprejudiced mind."

The court then said : "The opinion of the supreme court that I have before me sets out an instruction that they quote with approval. I will read that also;" and then read as follows:

"A reasonable doubt, gentlemen, is that state of the case which, after an entire comparison and consideration of all the evidence, leaves the mind of the jury in that condition that they cannot say that they feel an abiding conviction

to a moral certainty of the truth of the charge. A reasonable doubt is not every doubt. It is not a captious doubt. It is such a condition of mind, resulting from the consideration of the evidence before you, as makes it impossible for you, as reasonable men, to arrive at a satisfactory conclusion. It is not a consciousness that the conclusion arrived at may possibly be erroneous, but it is such a state of mind as deprives you of the ability to reach a satisfactory conclusion. A reasonable doubt is a doubt which has some reason for its basis. It does not mean a doubt from mere caprice or groundless conjecture."

It will be noted that the matter read from the opinion of this court and having its approval was additional to the instructions given to the jury on the subject in the first instance, but it was in substance the same, without amendment or modification in any particular. The defendant excepted, however, to the whole instruction and to the manner in which it was given, and now insists that the jury were not instructed in this particular in writing, and for that reason he should have a new trial. The statute provides that, if either party require it, and shall at the commencement of the trial give notice of his intention so to do, the charge of the court, so far as it relates to the law and the facts of the case, shall be reduced to writing, without any oral explanation, and filed with the clerk: B. & C. Comp. § 132, subd. 6. The purpose of this statute manifestly is to obviate the difficulty often experienced by parties and their counsel in reducing verbal charges to appropriate form for presenting alleged errors arising thereupon for review, and to prevent any dispute or cavil as to what the real or exact instructions of the court were, and to preserve them intact, without any shading of language or modification of thought or substance. It is appropriate, also, to prevent the trial court from laying particular stress or emphasis upon portions of the instructions that might well be calculated to attract the especial attention of the

jury, and thereby in a manner to control their action to suit the preconceived impressions of the judge as to the outcome of their deliberations. It has generally been held that statutes of this kind are mandatory, and should be strictly observed, and that any substantial noncompliance with their requirements will constitute ample grounds for awarding a new trial, and it cannot make any difference whether the instruction otherwise given than in writing is properly applicable to the facts of the case or not. Such statutes enunciate a right that the party is entitled to, and the courts cannot pare it off or circumscribe its operation without impairing the right itself. As was said by Mr. Justice ELLIOTT in *Bradway* v. *Waddell*, 95 Ind. 170, 173: "It surely is no hardship to require the court to do exactly what the law commands and the parties request. A line or two more costs but little labor, and prevents confusion, wrong, and error. There is really no excuse for refusing to do what the law commands, and what secures certainty and prevents needless wrangling. But, after all, a sufficient reason for the uniform ruling of this court is that the law commands that all instructions shall be in writing; and the more closely courts, as well as everybody else, are held to strict obedience to law, the better." The precept is enunciated and supported by numerous authorities: *Wheatley* v. *West*, 61 Ga. 401; *Willis* v. *State*, 89 Ga. 188 (15 S. E. 32); *State* v. *Bennington*, 44 Kan. 583 (25 Pac. 91); *State* v. *Stoffel*, 48 Kan. 364 (29 Pac. 685); *Ellis* v. *People*, 159 Ill. 337 (42 N. E. 873); *State* v. *Birmingham*, 74 Iowa, 407 (38 N. W. 121); *State* v. *Harding*, 81 Iowa, 599 (47 N. W. 877); *Hopt* v. *Utah*, 104 U. S. 631; *Bottorff* v. *Shelton*, 79 Ind. 98; *Smurr* v. *State*, 88 Ind. 504; *Sellers* v. *City of Greencastle*, 134 Ind. 645 (34 N. E. 534). The Indiana cases are especially valuable, as they are based upon a statute almost identical with our own.

Without else, we would be constrained to hold, in accord

with these authorities, that the action of the trial court in reading the matter from the supreme court report instead of incorporating it in a written instruction and giving it to the jury as written, was error, entitling the defendant to a reversal of the cause, and consequently a new trial. But the Criminal Code contains a provision for the guidance of the appellate court as follows : "After hearing the appeal the court must give judgment, without regard to the decision of questions which were in the discretion of the court below, or to technical errors, defects, or exceptions which do not affect the substantial rights of the parties": B. & C. Comp. § 1884. This statute, while it does not modify the one above discussed, nevertheless prescribes the character of error for which the judgment of the trial court shall not be reversed ; and when it appears from a scrutiny of the whole record that the error relied upon is technical, and does not affect the substantial rights of the defendant, the judgment appealed from will not be disturbed on account of such error. There could be no objection, when the request for further instructions was made, to the trial court's reading from the instructions theretofore given, because they were in writing, and had perhaps been filed with the clerk. What the court said preliminary to reading from the instruction and from the supreme court report did not constitute, in a legal sense, an instruction relating to the law and the facts in the case ; but the matter read from the report was plainly an instruction of that character. This was evidently taken down or reduced to writing, as we find it in the record here, but the method employed for so doing is not made to appear, nor is it material in the view we have adopted. There is not the least dispute as to the matter here in the record being the same in every particular as was read from the book to the jury, and the whole of it is here, and we know exactly what it is and its bearing in the case. Fur-

thermore, it is the same in substance as read to the jury
from the written instructions, and it went to them with-
out illustration or modification, so that it could not pos-
sibly have affected any substantial right of the defendant.
This is patent on the record, and we need have no recourse
to presumption or inference to make it appear, and, being
such, the error of the court in not transcribing the matter
read and then reading it to the jury and filing it with the
clerk must be classed as a technical error, not affecting
any substantial right of the defendant, and is not such,
therefore, as will warrant a reversal of the judgment.

We are supported in this view by pertinent authority
elsewhere. In *O'Donnell* v. *Segar*, 25 Mich. 367, it was
held that, where the record declares that the trial judge
made oral explanations to his written charge, it being
stated at length therein what was said, and it appearing
that it did not and could not modify or affect the written
charge, it did not constitute reversible error. So, it was
held in North Carolina, in *Currie* v. *Clark*, 90 N. C. 355,
where the trial court gave oral instructions not differing
from those set out in the written charge, and the appel-
lant made no suggestions to the contrary, that it did not
constitute ground for a new trial. And the court said in
*Hall v. Carter*, 74 Iowa, 364 (37 N. W. 956, 958), where
the court read to the jury the pleadings in the case to in-
dicate what the issues were, but did not incorporate them
in the written instructions (the jury, contrary to the prac-
tice prevailing here, having the right to take the instruc-
tions to their room for deliberation): "We do not think
this is a good practice. The entire record of the case
satisfies us, however, that no prejudice resulted from this
error of the court. The third paragraph of the charge pre-
sented the issues quite fully, and other paragraphs fur-
ther presented the issues, and directed the jury as to
their duties. Several special findings were returned, which

indicate that the issues were fully understood by the jury. We therefore conclude that the verdict should not be disturbed on the grounds just considered." In further illustration of the principle, see *Fry* v. *Shehee*, 55 Ga. 208; *Sellers* v. *City of Greencastle*, 134 Ind. 645 (34 N. E. 534): *National Lum. Co.* v. *Snell*, 47 Ark, 407 (1 S. W. 708); *Commonwealth* v. *Barry*, 11 Allen, 263.

6. Another error is assigned to the court's granting an order for the removal of the defendant from the Baker County jail without his consent. This, however, was but a proper and reasonable precautionary measure, adopted for keeping the defendant in custody awaiting his trial, and for his protection against mob violence, and was one of which he could not justly complain. This disposes of all the assignments of counsel, and finding no error affecting any substantial right of the defendant, the judgment of the trial court will be affirmed, and it is so ordered.

AFFIRMED.

Decided 15 June, 1903.