Argued at Pendleton October 28, affirmed November 26, 1918, rehearing denied April 1, 1919.

## STATE v. CHIN PING.

(176 Pac. 188.)

**Criminal Law—Change of Venue—Prejudice.**

1. In a prosecution for murder of a Chinaman by other Chinamen, *held*, under the evidence, that it was not error to refuse a change of venue on the ground of prejudice.

[As to change of venue, see note in 74 Am. Dec. 241.]

**Criminal Law—Codefendant as Witness—Effect of Separate Trial.**

2. Section 1531, L. O. L., requiring the discharge of a defendant jointly indicted with another in order to be made a competent witness, requires that where several joint defendants are on trial at the same time, and the state has not produced sufficient evidence to put any one of them on his defense, such codefendant shall be discharged, except where each of the codefendants has been granted a separate trial.

**Criminal Law—Harmless Error—Instruction.**

3. An instruction that flight and concealment might be taken into consideration on the question of guilt while erroneous was harmless, in view of other evidence, showing defendant's guilt.

**Criminal Law—Demonstrative Evidence—Revolver.**

4. In a prosecution for murder, an empty revolver found near defendant's place of concealment carrying bullets of the same caliber as those found in the body of deceased was admissible in evidence.

**Criminal Law—Jurisdiction—State and Federal Courts.**

5. That a murder is committed on a sidewalk in front of a building used by the United States government for a postoffice and land office does not deprive the state courts of jurisdiction, the United States not having exclusive jurisdiction over adjacent streets.

From Union: JOHN W. KNOWLES, Judge.

In Banc.

The defendant was indicted by the grand jury of Union County jointly with five other Chinese, for the crime of the murder of William Eng, another Chinaman. The record shows that on March 13, 1917, William Eng was deliberately killed, about 12 M., in front of the federal building occupied by the postoffice and United States Land Office on Adams Avenue in the City of La Grande, while a large number of people were on the street, and that from six to ten shots were fired, two of which struck Eng in the back and either of which would have proved fatal. The shooting was done by two other Chinamen, and besides instantly killing the victim, one of the shots struck a woman by the name of Celia George, breaking the tibia just above her ankle. One of the shots entered the back of Eng, passed through his heart and lodged in his breast under the skin, whence it was cut out and introduced in evidence. That was a soft-nosed 38-caliber bullet. The other shot entered his back and came out in the neck, severing the carotid artery. The shot by which Mrs. George's leg was broken was a 32-caliber bullet, and was also introduced in evidence.

The testimony tends to show that Chin Ping fired the two fatal shots which struck Eng in the back, from which the almost lifeless body of Eng fell to the sidewalk; that Chin Ping followed him up and after he fell stooped over his body and attempted to shoot him through the head; that he then started across the street and again returned and snapped his revolver at the head of Eng, still lying on the sidewalk, but did not fire another shot for the apparent reason that there were no more loaded shells in his gun.

When he was shot, Eng was on the sidewalk on Adams Avenue in front of the postoffice building; he

fell near the fountain, on the parking, close to the outer edge of the sidewalk, and the shots were fired by a Chinaman who stood in the street or on the parking or sidewalk. The ground was covered with about sixteen inches of snow which had been removed from the sidewalk and banked on either side. The shooting was done on one of the principal streets of La Grande and was more or less witnessed, among other persons, by George W. Kelly, Lee Stark, J. T. Williamson, Dr. C. B. Cauthorn, C. S. Dunn, Gordon Powers, Mrs. Celia E. George and Ralph Winters, who were called and testified on behalf of the state. The testimony also shows that the deceased was unarmed, was running away from and was pursued by the defendant Chin Ping at the time the shots were fired.

After the shooting, with the revolver in his hand the defendant with other Chinamen ran into some buildings occupied by the Chinese, on the opposite side of the street, between the livery-stable and the "Jap house," and disappeared. Within a very short time these buildings were surrounded by the city and county officers and persons who were called to their assistance to apprehend and arrest the murderers. While thus on guard and after a diligent search, about 5 P. M. of the same day witness Benham discovered a trap-door with a pair of hinges upon it in the floor of a bedroom in the rear of and adjoining the Joss House. There was an entrance from Adams Avenue to the front of the Joss House and through that to an adjoining bedroom and an alley on each side of the building, with an entrance from the east alley to the bedroom, and the trap-door was in the northeast corner of the bedroom. After making his discovery Benham removed a commode, a sewing-machine and a carpet which were placed over the trap-door and notified the

sheriff and the chief of police, who then tried to open the door and learned that it was fastened from the under side. They finally opened the door, under which they found the defendant and four other Chinese, a mattress, some quilts, a candle, matches and four revolvers, three of which were fully loaded and in the other there were five empty shells which seemed to have been recently fired, and one loaded cartridge. The pit in which the Chinamen were discovered appeared to have been freshly dug. It was about thirty-two inches deep, thirty-eight inches wide and eight and one-half feet long.

The record shows that during the afternoon an empty revolver was found in the snow in one of the outlying sheds, which had the appearance of having been recently fired, and that the size of the bullets of the two empty revolvers corresponded with those which were extracted from the body of Eng and the ankle of Mrs. George.

The defendant, with others, was indicted on June 13, 1917, by the grand jury of Union County for the murder of William Eng. Each of the defendants filed a demurrer to the indictment, and based upon affidavits tending to show that on account of passion and prejudice a fair trial could not be had in Union County, filed a motion for change of venue. Counter-affidavits were filed on behalf of the state and after argument the motion was overruled. Each of the defendants asked for and was granted a separate trial.

After the state had introduced its evidence and rested, the defendant here filed a motion to discharge from the indictment Chin Borkey, Louie Moon, Chong Bing, Ah Sam and Ching Lem, his codefendants, so that they could testify for him, which motion was over-

ruled. After all the testimony was taken the motion was renewed and again denied.

The court gave instruction number 5, as follows:

"I instruct you that flight and concealment, immediately after the commission of a crime is a circumstance which you may take into consideration in determining the guilt or innocence of the defendant; and if you find from the evidence beyond a reasonable doubt that immediately after the fatal shots were fired, which killed William Eng, that the defendant fled and concealed himself in a pit under the floor of an outbuilding adjacent to the Chinese quarters, then I charge you that you are at liberty to consider this circumstance along with the other evidence tending to connect the defendant with the commission of the crime"

—and refused to give defendant's requested instruction number 8, which is as follows:

"I further instruct you that flight or concealment of a person immediately after a crime has been committed, with which he is charged, is not a sufficient circumstance of itself to establish his guilt, but only a circumstance which the jury may consider along with all the other evidence in the case in determining the probabilities for or against him. The weight to which that circumstance is entitled is a matter for the jury to determine in connection with all the facts and circumstances introduced in evidence before you."

After trial the defendant was found guilty of murder in the second degree, from which judgment he prosecutes this appeal and in his assignments of error claims that the court erred:

First. In refusing to grant the defendants' change of venue.

Second. In refusing to discharge from the indictment his codefendants so that they could testify as witnesses for the defense.

Third.  In refusing to give defendant's requested instruction number 8.

Fourth.  In the giving of instruction number 5.

Fifth.  In the admission into evidence of plaintiff's exhibit number E–5, and

Sixth.  In that the Circuit Court of Union County had no jurisdiction of the defendants or of the crime committed.                                     Affirmed.

For appellant there was a brief over the name of *Messrs. Cochran & Eberhard,* with an oral argument by *Mr. Colon R. Eberhard.*

For the State there was a brief over the names of *Mr. John S. Hodgin,* District Attorney, *Mr. George M. Brown,* Attorney General, and *Messrs. Crawford & Eakin,* with oral arguments by *Mr. Hodgin, Mr. Brown* and *Mr. Thomas H. Crawford.*

JOHNS, J.—The defendant contends that he was entitled to change of venue and bases his motion upon an affidavit of one of his attorneys, to which are attached as exhibits two copies of the "La Grande Observer," a newspaper published in La Grande, and a copy of the "Eastern Oregon Weekly Republican," published in Union; another affidavit by the same attorney and one by another of his attorneys, supported by the affidavits of Clark Leiter and Dr. M. H. Hall, from which it appears that a crowd of about two hundred people assembled after the shooting, saying, "Drive them all out of town"; that the talk became general; that on March 15th a mass meeting of about one hundred and fifty people gathered at the city hall, attended by the city commissioners and other prominent citizens, culminating in the appointment of a committee for the holding of another meeting on the

following Saturday; that the records of the meeting
were destroyed; that the city of La Grande is the
county seat of Union County; that there was a strong
prejudice against the defendants and on account
thereof it would be impossible to give them a fair trial
in Union County, and that there existed in the city of
La Grande a Chinese society called the Hip Sing Tong,
which had employed special counsel to prosecute the
defendants. A change of venue to Wallowa County
was asked.

The state filed counter-affidavits of Fred B. Currey
showing that there was another Chinese society in La
Grande named the Hop Sing Tong, of which the de-
fendant and codefendants were supposed to be mem-
bers; of Fred J. Holmes, a prominent citizen of La
Grande; L. Rayburn, chief of police; L. J. Terrall, an
attorney; Thomas Brashear, a resident of Union
County for forty years; W. T. Wallsinger, a resident
of Union County, and John S. Hodgin, district attor-
ney; in all of which it was claimed and asserted that
there was no prejudice against the defendants; that
they could have a fair trial in Union County and that
anything which had been said or done was for the pur-
pose of enforcing the law and punishing the guilty.

It was a cold-blooded murder. While running from
his pursuer the deceased received two fatal shots in
his back, and after he fell mortally wounded his assail-
ant stood over his prostrate body and tried to shoot
him in the head, left him and then returned and again
snapped his empty gun at his victim's head. All of
this happened at noon in front of the postoffice, on one
of the main streets of the City of La Grande, and in
the presence of a number of its reputable citizens who
were pursuing their daily vocations. In the shooting
an innocent woman received a stray bullet in her ankle.

We are not fully advised as to the exact number, but believe that La Grande has a population of about seventy-five hundred people.  It is shown by the affidavits on behalf of the defense that out of the whole population, not to exceed two hundred people assembled at the place of the shooting and only about one hundred and fifty people were at the meeting; and it does not appear that there was any violence or any attempt at violence toward any of the defendants, or that the officers did anything more than ferret out the crime, arrest the defendant and his codefendants and put them in jail.

1. More than three months intervened between the commission of the crime and the trial of the defendant.  There is nothing in the record which shows that there was any trouble or delay in the selection of a jury, that the panel was even exhausted, that any citizen of La Grande served as a juror at the trial, that the defendant did not have a fair and impartial jury or that his conviction was the result of any passion or prejudice.  The judge who presided at the trial overruled the motion for change of venue.  In the case of *State* v. *Armstrong*, 43 Or. 207 (73 Pac. 1022), there was a much stronger showing for the defendant than in the instant case.  Similar affidavits were filed and in addition it appeared that threats had been made against one of the attorneys for the defendant; that there came from North Powder, in the vicinity, and arrived at Baker City in small parties during the day and evening, a mob consisting of from sixty to seventy-five men, which was later augmented to something like two hundred persons; that the attempt of the mob to take the law into its own hands was probably suggested by the action of the court in postponing the trial; that a body of from one hundred to one hundred

and fifty armed and masked men gathered at the county jail with the avowed purpose of lynching the defendant; that if the defendant were not convicted of murder in the first degree he would be shot in the courtroom and that for his safety it was necessary to remove him to the Multnomah County jail. As in the instant case, counter-affidavits were filed on the part of the state and the motion for change of venue was denied, the reasons for which were stated in a well-considered opinion written by Mr. Justice WOLVERTON, in which the rule was thus laid down:

"The determination of an application for a change of venue is a matter for the exercise of the discretion of the trial court, and its decision will not be reversed unless it appears that an injustice has resulted. In the present instance it is clear that the refusal to change the place of trial was not error. * * There was apparently no effort or design, even inferentially, to prejudice the cause of the defendant or to declare what should be his fate or to indicate to the public or those who might be called upon to dispense justice, what their verdict should be in the premises."

The same rule is also announced in *State* v. *Humphreys*, 43 Or. 44 (70 Pac. 824); *State* v. *Smith*, 47 Or. 485 (83 Pac. 865), and other decisions of this court. We think that no error was committed in overruling the motion for a change of venue.

Second, it is claimed that under Section 1531, L. O. L., the court erred in refusing to discharge the codefendants of Chin Ping so that they might testify as witnesses in his behalf. The record shows that when the prosecution rested the defendant asked that the state be required to say whether it had any further evidence connecting either of the remaining codefendants with the crime, but did not indicate the purpose for which the request was made. The court refused to

make the order and counsel for the state declined "to
show what evidence we have against the other defend-
ants here." After all the testimony was taken and be-
fore arguments were made by counsel, for the purpose
of defining. his position, the court said, among other
things:

"The state can only secure a conviction of the de-
fendant in this case upon the acts of the defendant
alone, and not jointly with any other of the codefend-
ants named in the indictment, and the jury must
be satisfied from the acts of the defendant alone,
and not from the acts of any other defendants
named in the indictment, that he committed the acts
set forth in the indictment, before they will be justified
in bringing in a verdict in this case."

2. Defendant's counsel then renewed their motion
for the discharge of the codefendants from the indict-
ment and specifically stated that the motion was made
for the purpose of using the codefendants as witnesses
for Chin Ping. The court again denied the motion.
The record shows that on his own motion each defend-
ant was granted a separate trial, and the defendant
here was then alone on trial. Section 1531, L. O. L.,
provides that where "there is not sufficient evidence to
put him on his defense, the court must if requested to
do so by another defendant, discharge such defendant
in order that he may be a witness for his codefendant."
This should be construed to mean that where there are
several joint defendants on trial at the same time and
the state has not produced sufficient evidence to put
any one of them on his defense, such codefendant
should then be discharged to enable him to be a witness
for the others on trial, and that in the absence of an
admission by the state it does not apply where each
of the codefendants has been granted a separate trial:
such is the construction placed upon it by Mr. Justice

RAMSEY in the case of *State* v. *Goff*, 71 Or. 352, 355, 356 (142 Pac. 564), where a similar motion was made and denied, and in which this court said:

"Each of the defendants was granted a separate trial and Goff was on trial when this motion was made; but Colvin and Clark were not on trial and there was no way in which the court below could know what evidence would be produced against them prior to their being put on trial, unless the prosecution had stated to the court what evidence it expected to produce against them. * * The trial court could not properly assume that there would be no evidence produced against Colvin and Clark except what was given on the trial of Goff. * * The grand jury had indicted them and that was *prima facie* evidence that there was sufficient proof to justify their indictment. Official duty is presumed to have been duly performed, and hence we must assume that the trial court was not of the opinion that there was not sufficient evidence to put Colvin and Clark on their trial, and hence denied said motion."

There was no error in denying the motion to discharge the codefendants.

3. It is next contended that the trial court erred in giving its instruction number 5 and in refusing to give defendant's requested instruction number 8. It must be conceded that the defendant's requested instruction stated the law and that the court's instruction was not technically correct. But under our view of this case, the question of flight, as well as the instruction bearing upon it, is wholly immaterial. It appears from the testimony of a number of reputable eye-witnesses that while retreating and being pursued by the defendant, the deceased was twice shot in the back, from the effects of which he was almost instantly killed; that he fell upon the sidewalk and was overtaken by the defendant, who, standing over his lifeless body, again attempted to shoot him in the head; that the defend-

ant went away, returned and again snapped his empty revolver at the head of the deceased. Regardless of any testimony or the instruction as to flight, it appears from the stubborn facts and the positive testimony of a large number of eye-witnesses that the shooting was a deliberate and premeditated murder. The defendant was not affected in a substantial right and this point comes under the provisions of Section 1626, L. O. L., as construed by this court in the case of *State* v. *Armstrong,* 43 Or. 207 (73 Pac. 1022), on page 221 of the report.

4. Error is charged on the court's receiving as evidence plaintiff's exhibit number 5–E, which was a revolver found lying in an outbuilding near the pit covered by the trap-door. The testimony shows that it was unloaded and had been recently fired and dropped where it was discovered; that the size of the bullets was identical with the shots which were fired at the time of the murder and everything indicated that the exhibit was one of the revolvers with which some of the shooting was done. We think that no error was committed in receiving this exhibit in evidence.

5. It is claimed that the Circuit Court of Union County did not have jurisdiction of the defendants or of the crime, for the reason that the shooting occurred on a street in front of and adjoining property which belonged to the United States government and upon which was a building used for a postoffice and land office. On this point the defendant's counsel cite and rely upon the case of *United States* v. *Battle* (C. C.), 154 Fed. 540, which was affirmed by the United States Supreme Court in 209 U. S. 36 (52 L. Ed. 670, 28 Sup. Ct. Rep. 422). From an examination of that case it appears that Battle was indicted by a federal grand jury for the murder of D. M. Berry and that the offense

"was charged to have been committed on a plot of ground in the City of Macon, Ga., which had been conveyed to the United States for the erection of a postoffice and federal court building, over which territory the state had surrendered jurisdiction, reserving the right to serve process and apprehend offenders there." If such a state of facts were shown to have existed in this case the point would be well taken.. We have carefully read all of the testimony offered at the trial, and outside of the fact that the land adjoining the street where Eng was killed was used as a site for a postoffice and land office building, there is no showing in the whole record that the United States government has the record, or any title to the land or any interest whatever in it. Again, the testimony is undisputed that the deceased was shot and killed on the sidewalk in front of the property; that he was thus shot and killed by the defendant and one of his codefendants while they were either on the sidewalk, the parking in front of the sidewalk or the street in front of the parking, and that during the shooting neither of the parties was on the lot occupied by the federal building.

Assuming that the title to the lot was vested in the United States for governmental purposes, yet it appears from the record that the crime was committed on one of the principal streets of the City of La Grande and that the street was then used and occupied by the public as such, and there is no pretense that the United States claimed or exercised any right of dominion over the surface of the street. While it was used for and remained a public thoroughfare, that right would be vested exclusively in the City of La Grande and through it in the state. Counsel for the defendant have not cited any authority and none can be found

which would give the United States exclusive jurisdiction over a street used for public purposes within the limits of an incorporated city, even though that street is in front of and adjoining a lot for which the government holds the record title and on which it has erected a postoffice building.

After a careful examination of all the testimony we are of the opinion that the defendant had a fair trial and that the judgment of the Circuit Court should be affirmed.     AFFIRMED.  REHEARING DENIED.

HARRIS, J., absent.