Argued 27 April; decided 11 August; rehearing denied 2 October, 1899.

## STATE *v.* WEAVER.

[58 Pac. 109.]

1. CROSS-EXAMINATION.—Where a defendant has undertaken on his direct examination to give a general account of the occurrences preceding the commission of the alleged offence, he may be asked on cross-examination as to details that he did not give.

2. HOMICIDE—EFFECT OF INTOXICATION.*—In determining whether a killing was done with deliberation or premeditation, the jury may consider the

---

*NOTE.—On the question what intoxication will excuse crime, there is an elaborate note to *Harris* v. *United States* (D. C. App.) 36 L. R. A. 465. See, also, a note on the subject of drunkenness as a defense to crime with *State* v. *Kraemer*, 62 Am. St. Rep. at p. 672.—REPORTER.

voluntary intoxication of defendant in connection with the facts generally; but voluntary intoxication cannot reduce a killing to manslaughter: *State* v. *Zorn*, 22 Or. 591, applied.

3. HARMLESS ERROR.—Error that may have intervened during the progress of a trial will not justify a reversal where it was favorable to the defeated party.

From Harney :    MORTON D. CLIFFORD, Judge.

James Weaver appeals from a conviction of murder in the second degree.           .           AFFIRMED.

For appellant there was a brief over the names of *Lionel R. Webster* and *George W. Hayes*, with an oral argument by *Mr. Webster*.

For the state there was a brief and an oral argument by *Messrs. D. R. N. Blackburn*, Attorney-General, and *William Miller*, District Attorney.

MR. JUSTICE BEAN delivered the opinion of the court.

The defendant was indicted for murder in the first degree in shooting and killing one William McKinnon, in Harney County, on the twenty-eighth of September, 1898. He was tried, and convicted of murder in the second degree, and appeals from the judgment which followed.

1.   We have carefully read the entire record, examined the several assignments of error and briefs of counsel, and, in our opinion, none of the alleged errors are sufficient to justify a reversal. The answer of the witness Lyde to the question propounded to him by the state's attorney was immaterial, and hence the error, if any, was harmless. The testimony of the witness Stancliff was competent as tending to show threats made by the defendant against the deceased. While the defendant was not asked on his examination in chief about the scuffling or wrestling which took place between him and

one of the other parties shortly before the homicide, yet he undertook to give an account in a general way of what occurred in the saloon from the time of his arrival until the homicide, and the cross-examination was, therefore, entirely proper. The same is true in reference to the questions asked in cross-examination as to where he obtained the pistol with which the shooting was done. He undertook, on his examination in chief, to account for the fact that he had a pistol in his possession at the time of the homicide, and it was perfectly proper for the state to cross-examine him in relation thereto.

2.   The instruction in reference to the voluntary intoxication of the defendant is substantially the same as that approved by this court in *State* v. *Zorn*, 22 Or. 591 (30 Pac. 317), and is, in our opinion, entirely sound. "Voluntary immediate drunkenness," say ANDERSON, J., in *Willis* v. *Com.*, 32 Grat. 936, "is not admissible to disprove malice, or to reduce the offense to manslaughter. But where, by reason of it, there is wanting that deliberation and premeditation which are necessary to elevate the offense to murder in the first degree, it is properly ranked as murder in the second degree ; as the courts have repeatedly decided [citing cases]." So, also, it is said by the Texas Court of Appeals, in *Pugh* v. *State*, 2 Tex. App. 545, that "the mere fact of drunkenness alone will not reduce to manslaughter a homicide which would otherwise be murder, much less extract from it its indictable quality. The fact of being drunk, or mere mental excitement or ungovernable rage which may be engendered by drinking intoxicating liquors, will not reduce the crime of a voluntary killing below the grade of murder." See, also, *Cartwright* v. *State*, 8 Lea, 376 ; *Haile* v. *State*, 11 Humph. 154 ; *McIntyre* v. *People*, 38 Ill. 514. It is only when the actual existence of some

particular motive, purpose, or intent is a necessary ele-
ment in the crime charged that the intoxication of the
defendant becomes important, and not when the essen-
tial ingredients of the crime are implied by law from the
manner of its commission.    It was therefore perfectly
proper to instruct the jury in the case at bar that upon
the question as to whether the killing was done with
deliberation or premeditation the intoxication of the de-
fendant could be considered in connection with all the
other facts in the case ; nor was it error to refuse to
instruct them that it might be sufficient to reduce the
crime to manslaughter.

3.    The remaining assignments of error relate to the
giving and refusal of certain instructions by the trial court
concerning the law of self-defense, but, as there was no
evidence upon which to base such a defense, errors com-
mitted in the charge upon that point furnish no ground
for reversing the judgment :   *Shorter* v. *People*, 2 N. Y. 193
(51 Am. Dec. 286);   *State* v. *Shippey*, 10 Minn. 223 (88
Am. Dec. 70).   It has often been held by this court that
an instruction upon a mere abstract proposition of law,
however correct, may be misleading and mischievous,
because it tends to draw the minds of the jurors away
from the facts of the case to something not in the record,
but which is assumed by the instruction to exist, and for
the giving of such instructions judgments have frequently
been reversed :   *Bowen* v. *Clarke*, 22 Or. 566 (29 Am. St.
Rep. 625, 30 Pac. 430);   *Pearson* v. *Dryden*, 28 Or. 350 (43
Pac. 166).   But of course this result can follow only
when the facts assumed in the instruction are adverse
and injurious to the party complaining, and not when in
his favor.    Here the instructions on the law of self-de-
fense were all in the interest of the defendant, and if, in
giving them, the court assumed that there was evidence
in the case tending to make out such a defense, it could

not have prejudiced the defendant in any way.   Now, the facts in the case, as disclosed by the testimony, are that on the night of the homicide the defendant and the deceased, together with quite a number of other persons, some of whom were intoxicated, were in a saloon in the Town of Burns, scuffling and wrestling, and otherwise conducting themselves in a rude and boisterous, although friendly, manner.   Among the number were four or five men known in the record as the "Prineville boys;" and the defendant, who seems to have been a resident of Burns, rather classed himself with them, and when they left the saloon, about 10 or 11 o'clock in the evening, some one said, referring to the defendant, "Put him out with the gang," or something to that effect, whereupon the deceased and the witness Gowan, taking the defendant by the arms, one on either side, pushed or led him to the door, and put him outside the building, in perhaps a rude, but not in an angry or threatening, manner, when the defendant immediately turned, and fired back into the saloon, killing McKinnon.  There is no evidence showing or tending to show that at the time of the shooting, or at any other time during the evening, his life was in danger, or that he was threatened with bodily harm, or that there was any ill feeling or anger towards him by any one. Taking his own version of the affair, there was no room for an application of the doctrine of self-defense.   He says that, after the Prineville boys went out, "Billy McKinnon, he says to me, 'You hollered for Prineville,' and I think I says, 'No I didn't,' and about that time some one gave me a shove, and shoved me and jerked me around there, and in the rounds they jerked the bottle from my pocket, and grabbed me in the face, and hurt my face. I kept telling them to let me be, and they wouldn't do it.   They grabbed onto me, and started to shove me towards the door.   I held back, but they got me about to

the door somewheres, and I thought I heard some one say, 'Do him up,' somewheres close to the door, and I went for my pistol right at the door, and they gave me a shove, and I shot as I went through the door, or just on the outside, I would not be sure which. I shot, and I didn't mean to hit anybody; I just aimed to scare them back until I could get away. I was afraid of them. I was afraid they would kill me, or hurt me awful bad." It thus appears that the defendant does not claim that any one threatened or attempted to take his life or do him any great bodily harm, and, besides, at the time of the shooting he was out of the building, and in no immediate danger. There was, therefore, no necessity for his taking the life of any of the parties in order to save his own, or protect himself from great bodily harm. Under these circumstances, an error in the instructions as to the law of self-defense could manifestly have been no injury to him.    Judgment affirmed.    AFFIRMED.

Decided 20 October, 1899; rehearing denied 8 January, 1900.