Motion for order directing Jackson County to pay cost of printing
appellant's briefs filed October 28, denied November 16, 1955.
Argued on the merits January 26, affirmed May 2, petition
for rehearing denied June 20, 1956, order of U. S.
Supreme Court dismissing appeal, January 16,
1957

## STATE OF OREGON *v.* JENSEN

289 P. 2d 687
296 P. 2d 618

*Edward C. Kelly,* of Medford, for the motion.

TOOZE, J.

This matter is now before us upon the motion of the defendant, James Norman Jensen, for an order directing Jackson county, Oregon, to pay the costs of printing defendant's briefs on appeal.

On October 15, 1954, defendant was convicted in the circuit court of the state of Oregon for Jackson county of the crime of murder in the first degree, and on October 19, 1954, he was sentenced by the court to the death penalty. On December 10, 1954, defendant duly served and filed his notice of appeal to this court from the judgment of conviction, all pursuant to the provisions of ch 138 of ORS. Long prior to the effective date of the statute hereafter discussed, the transcript on appeal, together with defendant's bill of exceptions, had been filed with the clerk of the Supreme Court, but defendant's opening brief had not been so filed.

Defendant now moves this court for an order directing the county of Jackson to pay the costs of printing his briefs on this appeal, and in support of his motion relies upon the provisions of ch 662, Oregon Laws 1955.

Chapter 662, Oregon Laws 1955, which was approved by the governor on May 24, 1955, and which became effective late in August, 1955, provides in part as follows:

"Section 2. (1) When any judgment of death is rendered *and no appeal to the Supreme Court has been taken,* an appeal to the Supreme Court is automatically taken by the defendant without any action by him or his counsel 65 days after the filing of the judgment.

"(2) *When an automatic appeal to the Supreme Court is taken* as provided in subsection (1) of this

section, the clerk of the court in which the judgment was rendered shall:

"(a) Within 70 days after the filing of the judgment, file with the Clerk of the Supreme Court the judgment roll and the transcript consisting of a copy of the judgment and such other papers as may be required by the Supreme Court.

"(b) Within 90 days after the filing of the judgment, transmit the transcript of testimony, depositions, exhibits and other papers containing the evidence heard or offered to the Clerk of the Supreme Court.

"Section 3. Within five days after the transcript has been filed as required by paragraph (a) of subsection (2) of section 2 of this Act:

"(1) The Supreme Court shall appoint counsel to represent the defendant if he is not already represented by counsel.

"* * * * *

"Section 5. *When an automatic appeal to the Supreme Court from a judgment of death is taken* as provided in section 2 of this Act and there is a showing to the Supreme Court that the defendant is without funds:

"(1) The county in which the judgment of death was entered shall pay the expense of preparing the transcript of testimony and printing the abstract of record and briefs of the defendant and costs assessed by the Supreme Court.

"* * * * *

"(3) Counsel appointed pursuant to subsection (1) of section 3 of this Act, shall be granted reasonable attorney's fees in an amount fixed and approved by the Supreme Court. Such fees shall be paid by the county in which the judgment of death was entered." (Italics ours.)

Defendant's motion is accompanied by an affidavit showing with sufficient certainty that he is without

funds with which to pay the costs of printing the briefs. He is represented by court-appointed counsel.

■■ This court has no jurisdiction or power, express or inherent, to order the county to pay the costs of printing defendant's briefs, unless such authority has been conferred upon it by the foregoing statute. The statute expressly grants us that authority in criminal cases where a judgment of death has been rendered and an *automatic appeal* as defined in the law has been taken to this court. But it is evident that it is only in cases involving an *automatic appeal* that the statute is applicable. The jurisdiction vested in us by the legislature is thus expressly limited by the terms of the statute. The instant appeal is not an *automatic appeal* under the statute; it is an appeal taken directly by the defendant. It is manifest that had the legislature intended to vest that authority in us in all appeals in criminal cases involving the death penalty, those pending as well as those arising in the future, it would have expressly so provided. It would not have singled out automatic appeals as described for the exercise of such authority. It might be well to point out that until the Law of 1955 was enacted, there was no such procedure in this state as an *automatic appeal*. The legislature had the right to cut its cloth according to its own measurements, and we are bound by the plain terms of its enactment.

Defendant suggests that we have the inherent power to allow his motion. It is unnecessary for us to discuss such inherent power as we might possess as an appellate court, constitutionally created, because it is clear that the relief prayed for in the instant motion is not such as could possibly be within our inherent power to allow.

The motion is denied.

## ON THE MERITS

*Walter D. Nunley,* District Attorney, Medford, argued the cause for respondent. With him on the brief was Alan B. Holmes, Deputy District Attorney, Medford.

*Edward C. Kelly,* Medford, argued the cause and filed briefs for appellant.

Before WARNER, Chief Justice, and ROSSMAN, LUSK, BRAND, LATOURETTE and PERRY, Justices.

LUSK, J.

James Norman Jensen and Donald Chesley were jointly indicted under the statute which provides that one who kills another in the commission of robbery is guilty of murder in the first degree. ORS 163.010 (1). Jensen, hereinafter referred to as the defendant, demanded and was accorded a separate trial, and by the verdict of the jury was found guilty as charged without recommendation of life imprisonment. He has appealed from the consequent sentence of death.

The indictment reads:

"The said James Norman Jensen and Donald Chesley on the 24th day of April, 1954, in the said County of Jackson and State of Oregon, then and there being, and then and there acting together, did then and there engage in the commission of the crime of 'Assault And Robbery While Armed With A Dangerous Weapon' by unlawfully and feloniously, while

being armed with dangerous weapons, to-wit: a 44 caliber British Bull Dog Revolver, a 38 caliber Iver Johnson Revolver and a Bludgeon made by placing a rock weighing 1-½ pounds into a shirt sleeve, knotted at one end, commit an assault upon one Hugh Hile, with intent, if resisted, to kill or wound the said Hugh Hile, and did then and there unlawfully and feloniously take paper currency, lawful money of the United States of America, and the property of the said Hugh Hile, in the amount of $85.00 from the person of the said Hugh Hile and against his will; and the said James Norman Jensen and Donald Chesley, while engaged in the commission of such crime of 'Assault And Robbery While Armed With A Dangerous Weapon', did, by their acts, kill one Fern Hile by striking her on the head with said bludgeon, above described, and with a hatchet.''

In addition to his plea of not guilty the defendant gave notice that he would show in evidence upon the trial that he was insane or mentally defective at the time of the commission of the alleged offense.

The defendant being without funds, the court appointed as his counsel Mr. Edward C. Kelly, an able and experienced member of the bar of Jackson County. The trial lasted ten days. The transcript of testimony comprises 1034 typewritten pages. There are also in the record voluminous affidavits in support of and in opposition to a motion for change of venue, and numerous exhibits, running into hundreds of pages of records, hearings, reports, correspondence, and other documents relating to the mental condition and prior criminal record of the defendant, who was 24 years of age at the time of the homicide and has spent most of his life since he was 14 years of age in detention homes, state mental institutions and prisons in California. It would seem that no evidence that could

conceivably throw light on the issue was overlooked either by the prosecution or the defense. It is certain that Mr. Kelly fully and faithfully discharged the trust imposed on him by the court to protect the legal and constitutional rights of the defendant.

The record leaves little, if any, room for debate about the controlling facts of the crime. It occurred when the defendant was enroute to his home in The Dalles, Oregon. He had but recently been paroled from San Quentin penitentiary in California. He hitch-hiked from San Rafael, California, and, sometime in the night of April 23, 1954, arrived in Medford, Oregon, where he fell in with his co-defendant Chesley, a youth 18 years of age. They decided to steal an automobile. In furtherance of that purpose they manufactured a ''sap'' by knotting a sleeve which they burned off of Chesley's shirt with a lighted cigarette and placing in it a large rock; broke into a secondhand store called Hobbs Trading Post and helped themselves to several revolvers and a length of clothes line; and set out through the town—it then being after midnight—to find a house with the lights on. They came to the dwelling house of Mr. and Mrs. Hugh Hile. Mr. Hile was in his living room engaged in typing letters for his lodge. His wife and their five children had gone to bed. Mr. Hile was summoned to the outside of the house by a knock on the door, escorted back into the house at the point of Chesley's gun, and, on demand of Jensen, delivered to them the keys to his automobile, fifteen dollars which he removed from his billfold, and the billfold itself which contained his driver's license, and, in a secret compartment thereof, eighty dollars. They tied up Hile with the stolen rope, gagged him, and one of them, probably Chesley, struck him several blows on the head with the sap, rendering him unconscious.

There was a hatchet in the living room standing against the fireplace. While these things were going on some of the children were awakened by a scream, and Lester, the eldest, aged 15, stepped to the door of the living room, where he was met by the defendant, who told him to go back to bed, that his mother and father were having an argument. The defendant said that he was a business associate of Lester's father. Lester returned to his room where he remained until he saw the lights of the family car go on. According to evidence which the jury was entitled to believe, Jensen picked up the hatchet, went to the bedroom where Mrs. Hile was sleeping, switched on the light, and killed her by striking her several times on the head with the hatchet. The evidence referred to consists of Jensen's own voluntary statements. He made other inconsistent statements, both out of court and as a witness, but for present purposes these are not important.

Having robbed and knocked out Mr. Hile and killed his wife, the defendant and Chesley fled in the Hile car, taking the loot with them. By evening of April 24 both men had been arrested and were in jail.

Most of the facts above stated were testified to by the defendant as a witness on his own behalf. He testified that he and Chesley planned to steal a car, and, in furtherance of that purpose, that they burglarized Hobbs Trading Post; that they took the rope "with the idea of tying someone up"; that, after robbing Hobbs Trading Post, they went through the town in the dead of night looking for a house with the lights on; that they might have intended to steal money but "primarily the reason we went in was to get the car keys"; and when they entered the Hile house he had two guns and Chesley one, and Chesley had the sap which he had helped Chesley to make. He described the manner in

which they gained entrance to the Hile house in the following language:

"Well, we walked by the house and decided to enter the house. We split up and one of us went to the back. I went to the back of the house and Chesley, the other fellow, went to what I thought was the front of the house. I guess it was the side entrance. When I reached the side entrance, after going around back of the house, Chesley had a gun turned on this fellow there that lived in the house. I went into the house and this man came in after me, followed by Chesley."

According to the defendant, it was he who tied up Hile, but Chesley who gagged him and knocked him unconscious. The defendant admitted that he picked up the hatchet, but claimed that he placed it on a snack bar adjoining the living room and did not pick it up again. He testified that he and Chesley went to Mrs. Hile's bedroom, turned on the lights, and saw her asleep on the bed; that he went to the bathroom to get tape to tie her with, and when he returned "the woman was being hit." He denied having struck her. In this part of his testimony he is contradicted by his three confessions, none of which are claimed to have been involuntary or induced by threats or promises. The statements in the confessions are to the effect that he himself killed Mrs. Hile by blows on the head with the hatchet. Whatever the truth may be as to this, there can be no question about the fact that Mrs. Hile was killed by either Jensen or Chesley or both of them while they were still engaged in the crime of robbery.

We turn to the assignments of error.

### Assignment of Error No. 11

Error is assigned to the court's denial of the defendant's motion for a change of venue.

■ The motion was presented to and denied by the Hon. Charles H. Foster, circuit judge for Lake County. The defendant made no objection to Judge Foster passing on the question, but it is now contended, not that Judge Foster did not have power to act, but that no one except Judge Hanna, the circuit judge for Jackson County, should have considered it. As Judge Foster is a circuit judge of this state and was sitting in Jackson County under assignment from the chief justice of this court (ORS 3.100), the contention is obviously without merit.

The motion for change of venue was supported by affidavits of citizens of Jackson County tending to show that it would not be possible for the defendants to obtain a trial by a fair and impartial jury of that county; by newspaper articles recounting what purported to be the facts of the crime and reporting such matters as the indictment, arraignment, and other pretrial procedural steps; by other newspaper articles and advertisements soliciting contributions for a fund raised for the benefit of the Hile family; by copies of two radio broadcasts by the district attorney; and by allegations that two magazines, "Official Detective" and "True Detective," containing "detailed and gruesome stories of the crime," had appeared upon the newsstands of Jackson County several weeks after its commission.

The broadcasts by the district attorney referred to were included in a news program of the local radio station, and were apparently made in pursuance of his practice of keeping the public informed of the activities of his office. In one of them, made on April 26, the district attorney referred to the "brutal killing of Mrs. Fern Hile," and stated that two men in custody made statements "which definitely tie them in with the mat-

ter of the homicide," and that "without any question, the Grand Jury will return an indictment against both of these men for first degree murder." In the other broadcast, made on April 27, after describing the arrest of Jensen and Chesley, in which the district attorney himself had taken a hand, he referred to statements made by the men "in which each confesses to participation in the brutal, senseless killing of Fern Hile and the vicious and repeated slugging of her husband, who is still unable to be questioned in the hospital." The broadcast concluded:

"These two men will be prosecuted as quickly as the processes of our system permit, and as vigorously and with all the force of the enforcement machinery of this county. I am advised that the death penalty has never been imposed in Jackson County. I say to you as a family man and as District Attorney for this county that I shall demand and expect to get a death penalty in this case for both the men presently in our custody for killing Fern Hile."

The prosecution met this showing with affidavits tending to portray a calm and impartial attitude of the people of the county toward the accused men. Some of the affiants called particular attention to the fact that the first natural reaction of horror and anger to a crime so shocking had abated and that the occurrence had ceased to be a subject of discussion. In this connection it should be observed that the trial of the defendant did not commence until October 5, 1954, more than five months after the commission of the crime.

The allowance of a change of venue is largely, if not exclusively, a matter for the exercise of the sound discretion of the trial court. *State v. Brumfield,* 104 Or 506, 513, 209 P 120, and Oregon decisions there cited. "This discretion, however, is judicial in its character,

and is subject to be reviewed for an abuse thereof, where palpable injustice has been done." *State v. Armstrong,* 43 Or 207, 211, 73 P 1022. And in determining whether there has been such an abuse the appellate court will consider whether in fact any unusual difficulty was experienced in obtaining a fair and impartial jury. *State v. Smith,* 47 Or 485, 488, 83 P 865. It will look to the record for light on that question. So, in the Armstrong case the court regarded as a significant circumstance the fact that a jury was obtained from a part of the regular jury and a special venire of 40 men. 43 Or at p 213.

By comparison with the sensational and lurid reporting of crime to which we have become accustomed in this country, the newspaper accounts before us are remarkably restrained and dispassionate. They contain no details of horror beyond the bare recital of the occurrence itself. There are no photographs accompanying them calculated to stir any emotions other than that of pity for the victims. They in no way resemble the newspaper articles in the Brumfield case, which are described in the opinion in that case as "commenting in the severest terms on the conduct of the defendant and asserting his guilt in unstinted, not to say intemperate, language." 104 Or 512.

■ Opinions may differ as to the propriety of the district attorney's broadcasts. We are not, however, concerned with a question of professional ethics but with the effect of the prosecutor's words on the temper of the people of the county and on the defendant's right to a fair trial. And it is, perhaps, a remarkable fact that of the 50 prospective jurors who were called and examined on the voir dire not one of them had heard either broadcast. Of those 50, 20 testified that they had formed opinions about the case, and 12 were excused

for cause. Eight venire men said they had opinions but could set them aside. None of these were accepted as jurors. Of the 12 peremptory challenges available to the defendant but 10 were exercised. In the Brumfield case defendant was forced to accept several persons as jurors who testified at first that they had formed opinions about the case which it would take evidence to overcome, but later, on questioning by the district attorney and the court, modified their statements by saying that if accepted as jurors they would be governed by the instructions of the court and decide the case solely upon the evidence produced at the trial. We have no such situation here. We are of the opinion that, in face of the conflicting affidavits, "reputable citizens who ought to have had opportunities to know the prevailing sentiment of the community being of the opinion that it was not such as to preclude the defendant from being given a fair and impartial trial" (*State v. Brumfield,* supra, 104 Or at p 512), the court did not abuse the discretion committed to it in denying the motion for a change of venue. We are fortified in this conclusion by the fact that there is nothing in the record to indicate that a fair and impartial jury was not actually obtained.

### Assignments of Error Nos. 1, 2, 3 and 4

These will be considered together as they raise related questions.

The court refused to give the following requested instructions submitted by the defendant:

### Requested Instruction No. XV

"I instruct you that if you do not find that defendant has proved he was insane beyond a reasonable doubt, as I have defined insanity to you, but

should find his mental condition to have been so affected or diseased that you have reasonable doubt as to his ability to intentionally or feloniously with common design with defendant Chesley to commit the crime of robbery upon Hugh Hile and in the course of such alleged robbery to have intentionally or feloniously killed Fern Hile as charged in the indictment, then you should find that defendant has not committed the crime of murder in the first degree as charged in the indictment, but may find the defendant guilty of some lesser degree of homicide in accordance with my instructions on such lesser degrees.''

### Requested Instruction No. XVI

''I instruct you that the evidence adduced during this trial to prove defendant's insanity shall be considered and weighed by you with all other evidence even though you do not find defendant legally insane, in regard to the ability of the defendant to premeditate, deliberate, act wilfully and act maliciously and if you find the defendant lacking in such ability, you should find the defendant could not have committed the crime of murder in the first degree, but may find the defendant guilty of some lesser degree of homicide in accordance with my instructions on such lesser degrees.''

The court sustained an objection made by the state to the following question propounded by counsel for the defendant to a prospective juror:

''Q And if he didn't prove, beyond a reasonable doubt, that he were so insane as not to know the difference between right and wrong, but nevertheless produced strong proof of insanity it might affect such matters as the degree of the homicide, or the matter of intent, or matters of that kind. Would you have any hesitancy in applying an instruction of the Court on that to the evidence you heard?''

The objection was "to these matters of mental instability or some degree less than insanity, upon the matter of intent." The court, in ruling, said "I think the test of insanity is the ability to distinguish between right and wrong," and again "The jury doesn't want to get the idea that it is going to change the degree, unless he is legally insane."

### Requested Instruction No. XI

"I instruct you that a criminal intent is a necessary element of any crime and no one can be guilty of crime who has not the mental capacity to have a criminal intent, but a man or woman who has sufficient mental capacity to realize that the act he is doing is wrong, forbidden by law, and will subject him to punishment, and to form and retain the requisite intent to commit a crime, and with that intent commits an act which the law forbids and punishes, is held responsible and cannot escape punishment for lack of mental capacity. Since a criminal intent is an essential element of every crime, it is necessarily an essential element of each degree of crime, and before you can find the defendant guilty of any crime, you must find beyond a reasonable doubt in your minds that such criminal intent existed in the mind of the defendant at the time of the crime charged in the indictment.

"The indictment in this case charges that the defendant acted unlawfully and feloniously. The doing of an act wilfully or unlawfully presupposes sufficient mental capacity at the time to exercise volition and sufficient power of mind to discern the moral quality of the act clear enough to comprehend whether it would be right or wrong, forbidden or unforbidden by law, and punishable or not punishable."

The court's instructions on insanity as a defense were identical with those approved in *State v. Brumfield,* supra, 104 Or at pp 537-540; *State v. Garver,* 190

Or 291, 297-298, 225 P2d 771, 27 ALR2d 105; and *State v. Leland,* 190 Or 598, 638, 227 P2d 785, 343 US 790, 96 L ed 1302, 72 S Ct 1002. See, also, *State v. Wallace,* 170 Or 60, 77-78, 131 P2d 222. They included the following:

"Insanity to excuse crime, must be such a disease of the mind as dethrones reason and renders the person incapable of understanding the nature, quality and consequences of his act, or of distinguishing between right and wrong in relation to such act.

"It is not every eccentricity of the mind, however well established, that will excuse the commission of an act otherwise criminal.

"If a party, notwithstanding some mental disease or infirmity, still has reason enough to know the act which he proposes to commit is wrong and unlawful, knows the nature and quality of the act, has the power of deliberation and premeditation, the power to do or refrain from doing the act charged as a crime, such mental disease or infirmity will not avail as a defense. In other words, while the law will not punish a person for an act which is the result of or produced by mental disease or infirmity, it will punish him for an unlawful act not the result of or produced by or influenced by mental disease, even though some mental unsoundness or infirmity is shown to have existed. In its legal sense, insanity is a defect or disease of the mind which renders a person incapable of entertaining a criminal intent.

\* \* \* \* \*

"There is a legal presumption that a person intends the ordinary consequences of his voluntary act. This is a disputable presumption and may be controverted or overcome by evidence, and so far as the capacity to form a criminal intent is concerned, it is sufficient to hold the defendant responsible under this indictment, when he did the act charged, and had sufficient reason and understanding to

know the nature, quality and consequences of the act he was doing and to distinguish between right and wrong in relation to that act as I have heretofore defined it to you.

＊　　＊　　＊　　＊　　＊

"If, after an entire consideration of the evidence in this case, you are satisfied beyond a reasonable doubt that at the time of the commission of the act charged in the indictment, if it was so committed as therein alleged, the defendant was laboring under a defect or disease of the mind which dethroned his reason, rendered him incapable of understanding or appreciating the extent, nature, quality and conseqences of the act he was committing, or that by reason of mental disease he was unable to distinguish between right and wrong in relation to such act, he should be acquitted upon the grounds of insanity, and if you should find him not guilty upon the ground of insanity, you must state that fact in your verdict."

██ It should first be observed that premeditation and deliberation as elements of the crime of first degree murder are not involved in this case. The statute under which the defendant was indicted provides "Any person who purposely, and of deliberate and premeditated malice, or in the commission of or attempt to commit rape, arson, robbery or burglary, kills another, is guilty of murder in the first degree." ORS 163.010. The defendant was indicted for a murder committed in the commission of a robbery. The robbery was proved beyond all question, as was the homicide, and if Mrs. Hile was killed "in the commission" of the robbery this is "the equivalent of 'deliberate and premeditated malice'" and the crime is first degree murder. *State v. Merten,* 175 Or 254, 259, 152 P2d 942; *State v. Dorland,* 161 Or 403, 404, 89 P2d 595; *State v. Brown,* 7 Or 186, 198; Wharton on Homicide (3d ed) 174 § 119.

Specific intention and purpose to kill under these circumstances are likewise irrelevant; even though the killing be accidental it is still first degree murder. *State v. Morris,* 83 Or 429, 445, 163 P 567; *State v. Brown,* supra at p 202. Furthermore, it is immaterial whether the defendant Jensen or his codefendant Chesley actually delivered the blows which killed Mrs. Hile. There was "a union of criminal intent" of Jensen and Chesley to commit the crime of robbery, and the act of one "in advancing the joint criminal object, was likewise a guilty act upon the part of" the other. *State v. Brown,* 113 Or 149, 153, 231 P 926; *State v. Carroll,* 155 Or 85, 62 P2d 830; ORS 161.220; *People v. Seiler,* 246 NY 262, 158 NE 615; 41 CJS 42, Homicide § 322. "From the beginning to the end they were engaged in a common crime, and the homicide was within the common purpose." *People v. Giro,* 197 NY 152, 158, 90 NE 432.

By the instructions the jury were authorized to find a verdict of first degree murder, second degree murder, or homicide. Under the evidence, it might well be argued that the defendant was not entitled to have the lesser degrees of the crime submitted. In *State v. Wilson,* 182 Or 681, 684-685, 189 P2d 403, we held that where a felony murder is charged and the evidence is such that different inferences may properly be drawn therefrom as to the degree, the court should instruct the jury as to the various degrees of homicide (see, also, *State v. Brown,* supra, 7 Or at p 210); but we further said:

"* * * Where, however, the evidence of a homicide shows that it was committed in the perpetration of, or in an attempt to perpetrate, one of the felonies enumerated in the statute defining murder in the first degree, and not otherwise, an instruction on the different degrees of homicide is improper." (182 Or at p 685.)

We held in the Wilson case that under the evidence it could not be said as matter of law that the defendant at the time he shot and killed the deceased was attempting to rob him, and reversed the judgment of conviction because of the court's refusal to instruct as to second degree murder and manslaughter.

But the circumstances of the homicide in the Wilson case were widely different from those with which we are dealing here, and there are numerous cases in which the courts have held that, where the homicide is committed on the premises where the felony, such as burglary or robbery, is perpetrated, the crime is either first degree murder or nothing, and the court is not required to submit to the jury the lesser degrees of murder. *State v. Anderson,* 10 Wash2d 167, 116 P2d 346; *People v. Michalow,* 229 NY 325, 128 NE 228; *People v. Giro,* supra; *Conrad v. State,* 75 Oh St 52, 78 NE 957, 6 LRA (ns) 1154, 8 Ann Cas 966; *Woodruff v. State,* 164 Tenn 530, 51 SW 2d 843; *State v. Mewhinney,* 43 Utah 135, 134 P 632. See the annotations, 102 ALR 1030, 27 ALR 1100, 21 ALR 628. In the case last cited the court said with reference to the statute of Utah which divides crime into degrees:

"* * * That statute should, however, not be given controlling effect in a case of murder committed in the perpetration of or attempt to perpetrate robbery, because a murder so committed is not divisible into degrees. In such a charge of murder the killing was either committed in the perpetration of or attempt to perpetrate robbery or it was not. If the evidence, as in the case at bar, is clear and undisputed that it was, then the murder is first degree murder and nothing else, and the mere fact that the jury has the power to ignore the evidence and find otherwise does not change the law."

This court has held that a killing committed by a robber while attempting to escape with the loot may be found to be a killing committed in a robbery and therefore first degree murder. In *State v. Brown,* 7 Or 186, 208-209, we said:

"When a person takes with force or violence the goods of another from his person or presence and against his will, he has committed robbery. Or to use the more exact phraseology of the old writers upon English criminal law, 'an act of violence constitutes robbery,' but it does not necessarily complete the crime. It constitutes robbery so far as to render the perpetrator liable to conviction for it; but the act of robbery itself may be prolonged beyond the time when that liability is fixed. When Brown and his co-defendants took the property by force from the person or presence of O'Shea, they committed the crime of robbery so far as to render themselves liable to punishment for it, but the robbery in contemplation of law was not completed until the taking and carrying away was ended. The asportation of the goods is a necessary ingredient of the robbery, as essential to complete the crime as violence to the owner, or as the seizure itself. And while anything remains to be done by the robbers to secure complete control over the property taken the robbery is incomplete. The act of taking and carrying away in the case of Brown and his co-defendants, commenced when the seizure was made in the pawn-shop of O'Shea, and continued until they had unmolested dominion over the property which they had taken. When they first acquired that control the robbery was ended, and not before."

In the instant case it is difficult to understand how it would be possible under the evidence to find that Mrs. Hile was killed oherwise than in the commission of a robbery. Having forced their way into the house at the point of a gun and robbed Hile, beaten him into unconsciousness, and bound and gagged him, the de-

fendant and his accomplice then killed Mrs. Hile and fled in their victims' automobile, taking the loot with them. If what was said in the Brown case was a correct statement of the law—and we have no doubt that it is—then it would seem that the court would have been justified in refusing to submit to the jury any question but first degree murder or not guilty. Since, however, the court did instruct also on second degree murder and manslaughter we need not determine that question.

The evidence relative to the defendant's mental condition discloses that he is and had been for a number of years "a psychopathic personality." As described by a witness for the state, Dr. David G. Schmidt, a psychiatrist, who, as medical director of San Quentin penitentiary in California, had a good deal to do with the defendant, diagnosing his ailment and prescribing treatment for him, a psychopath "has emotional instability, or he has anti-social behavior. He is against everybody and against society, or he is asocial. But he has no mental impairment which deprives him of the ability and power to distinguish right from wrong." It is the sum of Dr. Schmidt's testimony that the defendant is not insane in the legal sense. His opinion was supported by the testimony of Dr. Gerhard B. Haugen, a Portland psychiatrist, who stated that "the current official term is a sociopathic personality" rather than "psychopathic." See Weihofen, Crime, Law and Psychiatry, 4 U of Kan L Rev 377 (March 1956). A great mass of documentary material from California State mental hospitals and prisons, introduced in evidence by the defendant, is replete with diagnoses which accord with the opinion of Dr. Schmidt and Dr. Haugen. There is no expert or psychiatric testimony to the contrary. Mr. Loren Elliott Mes-

senger, professor of psychology at Southern College of Education and not a medical doctor, testified for the defense on the basis of certain recognized tests he had given the defendant. He likewise diagnosed the defendant as a psychopathic personality, but expressed no opinion as to whether he was legally insane or not.

Requested Instruction No. XV was not a correct instruction in any view of the law because it would have submitted to the jury the question whether the defendant had the ability ''to have intentionally or feloniously killed Fern Hile as charged in the indictment,'' whereas the *intentional* killing of Fern Hile was not, as we have seen, an element of the crime charged. But, that objection apart, the request was properly refused.

██ The legal proposition implicit in the requested instruction is that mental impairment not amounting to insanity, but which destroys the ability of the accused to form a criminal intent, may serve to reduce the degree of the crime to second degree murder or manslaughter. As applied to this case at least, the proposition conflicts with the well-established law of this state. The only criminal intent necessary to be alleged or proved was the intent to commit the crime of robbery. Wharton on Homicide (3d ed) 175 § 119. If the defendant did not have the mental capacity to form such an intent then he was not guilty of any crime whatever. The logical conclusion to any instruction which assumed a finding that the defendant was not mentally capable of forming such an intent would not be that the degree of the crime would thereby be reduced, but that the jury must return a verdict of not guilty. The court's instructions on insanity, which were given at the request of the defendant, informed the jury that ''insanity, to excuse crime, must be such a disease of the mind as dethrones reason and renders the person

incapable of understanding the nature, quality and consequences of his act, or of distinguishing between right and wrong in relation to such act.'' With respect to a criminal intent the jury were told ''in its legal sense insanity is a defect or disease of the mind which renders a person incapable of entertaining a criminal intent.'' And, further, that ''so far as the capacity to form a criminal intent is concerned, it is sufficient to hold the defendant responsible'' if he ''had sufficient reason and understanding to know the nature, quality and consequences of the act he was doing and to distinguish between right and wrong in relation to that act as I have heretofore defined it to you.'' The court further instructed the jury that if they were satisfied beyond a reasonable doubt that the defendant was laboring under a defect or disease of the mind such as had been described, it was their duty to find him not guilty upon the ground of insanity. These instructions embody the firmly established law of this jurisdiction. They equate the ability to entertain a criminal intent with the ability to understand the nature, quality and consequences of the act and to distinguish between right and wrong. But under the requested instruction the jury would have been authorized to find that, even though the defendant was of sound mind in the legal sense, he did not have the mental capacity to intend to commit the crime of robbery. That is not the law of this state. Such a conclusion, perhaps, brings the court into the midst of what we termed ''the conflict between psychiatry and the law'' in *State v. Wallace,* supra, 170 Or at p 77, but, as we said in that case, we cannot ''constitute ourselves a psychiatric board to explore the hidden mysteries of the mind,'' but must limit ourselves ''to the difficult application of the rules for the determination of 'responsibility'.''

On the general question whether mental deficiency may be such as not entirely to relieve the accused of criminal responsibility, yet may serve to reduce the degree of the homicide, the courts are not in agreement. *Fisher v. United States,* 328 US 463, 473, 90 L ed 1382, 66 S Ct 1318, 166 ALR 1176; 40 CJS 826, Homicide § 4; 1 Warren on Homicide (perm ed) 194-195 § 61. The only case in which this court has been called upon to pass upon the question is *State v. Brumfield,* supra, in which the circuit court was requested by the defendant to give an instruction to the effect that, if the jury failed to find that the defendant was legally insane, yet they might find that his mental condition was such as to render him incapable of forming an intent to kill and deliberating in cool blood, in which case he could not be guilty of murder in the first degree even though he was able to distinguish right from wrong. 104 Or at p 536. This court held that no error was committed in refusing to give the instruction. In *State v. Wallace,* supra, we construed the provision of ORS 135.870, which requires a defendant, who proposes to show in evidence that he was "insane or mentally defective at the time of the alleged" crime, to file timely written notice of such purpose, and held that the statute was valid and applicable, not only where insanity is to be employed as a defense, but to reduce the degree or mitigate the punishment (170 Or at p 104). We were not required in that case to consider, and we did not consider, the circumstances under which mental defectiveness, as differentiated from legal insanity, might be urged. The defendant argued "that evidence of insanity or mental defect, if not admissible as a defense under the statute, should in any event be received as bearing on the issue of premeditation and deliberation and for the enlightenment of the jury in determining

the penalty—whether death or life imprisonment.'' 170 Or at p 103. Without determining the relevancy of evidence of mental defect to the purposes stated, we held that, since no notice of a purpose to rely on such evidence had been given, it was not available to the defendant.

The contention of the defendant that *State v. Leland,* supra, supports the partial responsibility theory cannot be sustained. It is true that an instruction apparently based upon that theory was given in the Leland case. But this court was not called upon to determine whether it would have been error not to give it, and the reference to it in the opinion of the Supreme Court of the United States was merely by way of answer to the contention of the defendant that our statute requiring a defendant, relying upon insanity as a defense, to prove his insanity beyond a reasonable doubt (ORS 136.390) in effect requires the defendant to establish his innocence by disproving beyond a reasonable doubt elements of the crime necessary to a verdict of guilty and is, therefore, unconstitutional. The Supreme Court cited the instruction in question and others given by the trial judge to show that the ultimate burden of proof did not shift, but rested upon the state throughout the trial. See 343 US at pp 793-796. In *Fisher v. United States,* supra, the Supreme Court, in a five to three decision, affirmed a conviction of first degree murder in the District of Columbia in a case in which the trial judge refused to give a requested instruction, which declared in effect that mental deficiency, which does not show legal irresponsibility, is a relevant factor in determining whether the accused is guilty of murder in the first or second degree. The court there considered an argument similar to one which has been made here, based upon its

own prior decision which reversed the Supreme Court of Utah for failure to give a partial responsibility charge upon evidence of drunkenness in language said to be broad enough to cover mental deficiency. *Hopt v. People,* 104 US 631, 634, 26 L ed 873. The case was distinguished on the ground that the rule was established by a statute of the Territory of Utah. That statute is similar to ORS 136.400, which provides:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition; but whenever the actual existence of any particular motive, purpose or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the defendant was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act."

Although some courts have applied the doctrine of partial responsibility so as to permit reduction of the degree of the crime in a murder case in which the prosecution must prove premeditation and deliberation as elements of first degree murder (see, e.g., *State v. Green,* 77 Utah 580, 6 P2d 177, 186), we are aware of no decision of that kind in a felony murder case. The decisions cited by the defendant, to which we will now refer, lend his contention no support. The holding in *Terhune v. Commonwealth,* 144 Ky 370, 138 SW 274, which was a prosecution for robbery, is that the defendant was entitled to an instruction that if he was "so drunk that he did not have the intention of robbing" the victim the jury should find the defendant not guilty. In *State v. Reagin,* 64 Mont 481, 210 P 86, the defendant killed a man in the commission of a robbery. He claimed that he was so far under the influence of liquor that he was incapable of entertaining the felonious in-

tent to commit robbery. The Montana statute respecting intoxication as a defense to crime is like ours. An instruction on the subject was given. The court held that if he was capable of entertaining the felonious intent to commit robbery, and, in pursuance of that intention and while carrying it into execution, he killed the deceased, he was guilty of first degree murder, and that under the evidence there was no error in failing to instruct upon second degree murder and manslaughter. *Commonwealth v. Wooding,* 335 Pa 555, 50 A2d 328, was another case of murder in the commission of a robbery. The court said:

"As the murder of Burnby was committed in the perpetration of a robbery it was not incumbent upon the Commonwealth, in order to establish the offense as one of murder in the first degree, to prove premeditation and a specific intent to take life; therefore the fact that defendant had possibly been drinking and smoking to excess was of no legal significance as bearing upon the degree of the murder. The crime which he committed was murder in the first degree and could not, under the facts, have been anything else."

Respecting evidence in the case that the defendant was mentally defective, the court held that the jury could take this into consideration in fixing the penalty, but that the trial judge was not obliged to instruct upon this subject. *People v. Martinez,* 38 Cal2d 556, 241 P2d 224, holds that evidence may be received to show that the defendant was intoxicated to the degree that he did not have the capacity to form the specific intent essential to first degree murder. Cf. *People v. Troche,* 206 Cal 35, 273 P 767, in which it is held that "the insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree." In *People v.*

*Murphy,* 1 Cal2d 37, 32 P2d 635, the charge was a killing perpetrated by torture which, under a California statute, is made first degree murder. The Supreme Court, reviewing the conviction under a power conferred upon it to modify a judgment when the evidence indicates that the defendant is "not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof," affirmed a sentence of death. The court considered evidence of intoxication, and held that it was essentially a question for the trier of the facts whether the intoxication of the accused precluded him from "forming a specific intention to kill and murder, which intent is a necessary element in murder of the first degree." But the court was not satisfied to rest its decision solely on that ground, and added:

"However, we need not rest an affirmance of the judgment solely on the foregoing reasoning. There are certain kinds of murder which carry with them conclusive evidence of premeditation. These the Legislature has enumerated in the statute (section 189, Pen. Code), and has taken upon itself the responsibility of saying that they shall be deemed and held to be murder in the first degree. These cases are of two classes. When the killing is perpetrated by means of poison, lying in wait, or torture, the means used is held to be conclusive evidence of premeditation. When the killing is done in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, the occasion is made conclusive evidence of premeditation. People v. Sanchez, 24 Cal. 17, 29, 30; People v. Milton, 145 Cal. 169, 170, 78 P. 549. If a case falls within either of these classes the statute determines that the killing is willful, deliberate, and premeditated and the trier of the facts has no alternative but to find the offender guilty of murder in the first degree."

Other cases cited by the defendant announced the well-established rule that where a particular intent is an element of the crime charged the state must allege and prove such intent, and in some of them it is held that intoxication may be shown as negativing the capacity to entertain such in intent. *State v. Byers,* 136 Wash 620, 241 P 9; *State v. Garney,* 122 Mont 491, 207 P2d 506; *People v. Sanchez,* 35 Cal2d 522, 219 P2d 9; *People v. Pineda,* 41 Cal App2d 100, 106 P2d 25.

Oregon decisions relied on by the defendant are of like kind to those from other jurisdictions involving voluntary intoxication. They are governed by the statute on that subject, and hold that where premeditation and deliberation must be shown such intoxication may reduce the crime to second degree murder. See *State v. Trapp,* 56 Or 588, 109 P 1094; *State v. Blodgett,* 50 Or 329, 92 P 820; *State v. Weaver,* 35 Or 415, 58 P 109; *State v. Zorn,* 22 Or 591, 30 P 317.

We have seen no authority which supports the defendant's position. It conflicts with the law of this state and with decisions upon which the defendant relies. We hold that in the case of a felony murder, mental defectiveness short of insanity cannot be availed of to reduce the crime from first degree murder to second degree murder or manslaughter. Hence, the court committed no error in refusing to give Requested Instructions Nos. XV and XVI, and in sustaining the objection to the question asked by counsel for the defendant on the voir dire based on that theory of the law. Requested Instruction No. XVI contains the additional fault of including the elements of premeditation, deliberation and malice, which, as we have seen, are not involved.

■■ Requested Instruction No. XI is no doubt a correct statement of the law insofar as it defines the test

for determining the capacity to form a criminal intent. In that respect it contradicts requests Nos. I and II. The test cannot be at the same time the ability to distinguish between right and wrong and something quite different, as stated in requests Nos. I and II. Essentially, the rules of law included in Requested Instruction No. XI were adequately covered by the instructions given by the court. We have already quoted the court's instruction embodying the test for capacity to form a criminal intent. At other places in the instructions the court used the expressions "knowingly and with criminal intent," "unlawfully and feloniously," "intentional participation." The court instructed the jury to return a verdict of not guilty upon the ground of insanity if they were satisfied beyond a reasonable doubt that the defendant was insane under the definition given to the jury, and that an insane person was incapable of forming a criminal intent.

The court further instructed the jury that where "the killing was while the defendant was engaged in the commission of a * * * robbery * * * deliberation and premeditation is not required, and if the killing is done in the commission of a robbery * * * it is murder in the first degree whether *the killing* was intentional, unintentional, or accidental." (Italics added.) Viewing the instructions as a whole, we think that the jury were sufficiently advised that a criminal intent was an essential element of the crime of robbery and that the burden was upon the state to prove such intent as well as all the other elements of the crime charged in the indictment. The court committed no error in refusing to give the instruction under consideration.

## Assignments of Error Nos. 5, 6, 7 and 8

These assignments all relate to the admission, over defendant's objections, of evidence of other crimes than that charged in the indictment. The incidents in question occurred after the homicide and while the defendant and Chesley were making their escape and in furtherance thereof. Briefly they were as follows: (1) Shortly after the homicide the defendant, while driving the Hile car the wrong way on a one-way street in Medford, turned the car around and drove in the opposite direction in order to avoid an approaching police car. (2) Before leaving Medford the two men planned to abandon the Hile car and steal another car in which to escape, but evidently became alarmed and abandoned the attempt. (3) They left Medford by way of the Crater Lake road, ran out of gas, and separated. The defendant entered a house, which was unoccupied at the time, and stole a .22 rifle and two boxes of shells. This occurred sometime on the day of the homicide. The defendant was arrested in a store at Prospect, a town some 60 miles from Medford, at about 7:00 p. m. on that day.

The law governing the admission of evidence of other crimes was fully explored by Mr. Justice BRAND in the opinion he wrote for the court in *State v. Long,* 195 Or 81, 112-119, 244 P2d 1033. It is sufficient here to state the conclusion of the Long case, namely, that the rule excluding such evidence does not apply to evidence which is relevant to the issue. Here the defendant was in flight, and acts done by him in furtherance of his escape could be shown notwithstanding the conduct was criminal. See Underhill's Criminal Evidence (4th ed) § 184, cited in *State v. Long,* supra, at p 114. But, even though the evidence here were to be

held irrelevant, its admission could not be deemed a ground for reversal. The defendant himself, apparently as a part of his defense of insanity, introduced evidence of a criminal career which included numerous felonies, among them armed robbery, burglary, and attempted rape. The objection to proving other crimes is that it tends to present the defendant to the jury as a bad man generally and to prejudice their minds against the accused, and to predispose them to a belief in his guilt. 1 Wharton's Criminal Evidence (11th ed) 487 § 344. It would seem to be obvious that, under the record in this case, the evidence of collateral crimes introduced by the state could have added nothing to the adverse effect of similar evidence introduced by the defendant himself.

### *Assignment of Error No. 9*

The defendant requested the court to give the following instruction:

"The defendant in this case has introduced evidence of his having been adjudged insane by the Superior Court of California for San Bernardino County. I instruct you that if you find that defendant was adjudicated insane he is deemed to have continued in such a mental state until such time as evidence of his sanity thereafter is introduced."

The court instead instructed as follows:

"I instruct you that when permanent, chronic or continuous insanity is once proved to have existed at some time prior to the alleged crime, it will be presumed to have continued and to have existed at the time of the alleged crime unless the contrary is proved, and in this connection you may take into account any prior adjudication of permanent, chronic or continuous insanity, if you find there was such adjudication."

■ The instruction given harmonizes with the law on this subject as determined in *State v. Garver,* supra, 190 Or at pp 299-308. The judgment of the Superior Court of California for San Bernardino County, dated December 18, 1945, referred to in the requested instruction, was a commitment, dated December 18, 1945, of the defendant as a "psychopathic and defective delinquent" to a state hospital in California. The statute under which the proceeding was brought provides for the commitment of minors who are "mentally defective" or "psychopathic delinquents" and specifically excludes any minor who is not a "proper subject for commitment * * * to a State hospital as an insane person." Deering's California Codes, Welfare and Institutions § 7050. The petition on which the order was based does not charge the defendant with insanity but that he was "a psychopathic and defective delinquent." The order is on a printed form from which the words "mentally ill or insane person" were 12 times deleted and the words "psychopathic and defective delinquent" interlined in their place. It is not an adjudication of insanity. Even so, it was later set aside. The defendant introduced in evidence a report and recommendation of the medical superintendent of Sonoma State Home dated March 26, 1948, which, after relating various episodes in the history of the defendant, concludes:

"* * * The diagnosis of Psychopathic Delinquent was confirmed, patient was returned to the Court with the statement that he would not benefit from further hospital care and treatment and since he is sane it was recommended that he be held legally responsible for his acts. Patient was, therefore, sentenced to San Quentin on 11-24-47."

The same court which made the order of commitment sentenced the defendant to the penitentiary. Under these circumstances the defendant was not entitled to an instruction on the presumption of continued insanity based specifically on the action of the Superior Court for San Bernardino County, California. The instruction which the court gave was adequate to protect the defendant's rights, and the assignment of error is without merit.

### Assignment of Error No. 10

■ Error is assigned to the court's refusal to give the following instruction requested by the defendant:

"I instruct you that in the event you find the defendant guilty of murder in the first degree as charged in the indictment that in considering whether to return such verdict without recommendation or with recommendation of life imprisonment, it is the law that life imprisonment means imprisonment for life."

The request harks back to the case of *State v. Leland,* supra, 190 Or at pp 619-623, in which we held that it was improper for the court, during the voir dire examination, to comment on the possibility of a parole in the case of a sentence of life imprisonment, but that any harm that might have been done was cured when the court told the jury in its charge that they should assume that "life imprisonment means imprisonment for life." Nothing occurred in the trial of this case which called for a similar instruction. The Constitution provides "The penalty for murder in the first degree shall be death, except when the trial jury shall in its verdict recommend life imprisonment, in which case the penalty shall be life imprisonment." Art I § 37. The court in its charge so informed the jury and

that it was their exclusive function to determine the penalty. There was no occasion, and there should not be in any capital case, to advise the jury that the Constitution means what it says.

### Assignments of Error Nos. 12 and 13

These assignments deal with objections made by the defense to questions asked on cross-examination of two witnesses for the defendant whose testimony was taken by deposition on written interrogatories and cross-interrogatories.

The witnesses were Dr. W. M. O'Brien, assistant superintendent at Mendocino State Hospital at Talmage, California, and Dr. M. E. Porter, superintendent and medical director of Sonoma State Hospital at Eldridge, California. They testified on direct examination as to certain records pertaining to the defendant while he was an inmate of their respective institutions. They identified the records and explained how they were kept. In other words, their main function as witnesses was to qualify the records for admission in evidence, and they were admitted without objection. Both witnesses, however, were asked on direct examination whether they had ever diagnosed the defendant and if so what their diagnosis was. Dr. O'Brien had no acquaintance with the defendant, but, in answer to that question he volunteered the information, among other things, that the defendant, while at Mendocino State Hospital, had been twice diagnosed as "without mental disorder, but psychopathic personality." The answer was obviously based upon information contained in the file. Dr. Porter, however, had on three different occasions examined the defendant and diagnosed him as a "psychopathic delinquent."

On cross-examination both witnesses were permitted, over objections by the defendant, to answer questions as to whether the defendant was a psychopathic personality and whether there was any psychosis present. Both stated that there was no psychosis, Dr. O'Brien expressly basing his answer on the findings contained in the hospital record and Dr. Porter, who is a psychiatrist, on his own examinations of the defendant. Both witnesses explained the difference between psychopathic and psychotic as it is generally understood by psychiatrists and the courts (See Weihofen, Mental Disorder as a Criminal Defense, p 22); and both testified that the defendant was capable of realizing the direct physical consequences of an act done by him, of accurately characterizing any given act as being socially acceptable or unacceptable, and of distinguishing between right and wrong.

It certainly cannot be said that the cross-examination of Dr. Porter was beyond the scope of the direct examination. With respect to Dr. O'Brien the question is somewhat different. His voluntary statement on direct examination concerning the matter which he concededly knew nothing about except as it was disclosed by the record which he produced should not have been permitted to go into evidence, but that was not the state's fault for it was the defendant who introduced it. Technically, the objection to cross-examination of Dr. O'Brien by the state respecting the defendant's mental condition should have been excluded, since it appeared that he had no personal knowledge of the subject. But, whatever error there may have been in the ruling, it was obviously harmless. The testimony of Dr. O'Brien insofar as it related to defendant's mental condition, amounted to no more than a summarization of the information contained in the records

which he identified. By putting these records into evidence the defendant sought to establish the very facts brought out on the cross-examination of the witness, and the records were in complete accord with all the numerous other records pertaining to the defendant's mental status introduced in evidence by the defendant himself. Under our statute a judgment of the circuit court "shall only be reversed  *  *  *  for errors substantially affecting the rights of the appellant." ORS 19.120. That the admission of the evidence complained of could not have harmed the defendant is too plain for argument.

### Assignment of Error No. 14

The assignment is directed to the court's refusal to instruct the jury on the various degrees of murder in the language of a request submitted by counsel for defendant. We need not set out the requested instruction. It could not properly have been given in any event for it includes an instruction on involuntary manslaughter, of which there is no evidence. We have already indicated the grave doubt we entertained as to whether the court was obliged to submit any other questions than first degree murder or not guilty. However that may be, the court correctly defined first degree murder, second degree murder, and manslaughter, and submitted to the jury appropriate verdicts for each degree of the crime charged. In the circumstances of this case nothing more was required.

### Assignments of Error Nos. 15, 16, 17 and 18

These all relate to the admission in evidence of so-called "gruesome" exhibits over defendant's objections. They consist of photographs of the body of

the victim of the homicide, and a sheet, blanket, and two pillows, all stained with the blood of the victim and taken from the bed in which she lay at the time she was murdered. It is too late today to contend that in a capital case evidence which might shock the sensibilities of jurors is for that reason inadmissible. *State v. Leland,* supra, 190 Or at p 598. Counsel for defendant does not so contend, but argues that the exhibits were irrelevant. Of course, to bring into the case wholly irrelevant evidence of a gruesome character merely for the purpose of exciting feelings of hate on the part of the jury against the defendant would be indefensible and intolerable. On the other hand, the prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce. No one would be heard to object to testimony which does no more than faithfully describe the wounds which were inflicted upon the victim of a homicide, no matter how horrifying the narration might be. But a photograph of the corpse may fortify the oral testimony. Should it be excluded because it is, perhaps, even more revolting? We think not, as long as the defendant stands upon his plea of not guilty and the burden remains with the state of proving that the victim met death by the criminal agency alleged in the indictment.

██ In these matters much is to be left to the discretion of the trial judge. The test is not whether the case might have been fully proved without the evidence objected to, but whether such evidence tends to establish the truth of the charge. We have given the matter careful consideration and cannot say that there was any abuse of the court's discretion in admitting the exhibits in question.

## Assignments of Error Nos. 19, 20 and 21

■■ These assignments raise the same question that was settled by *State v. Leland,* supra, 190 Or at pp 623-626, where we held that, if a prospective juror entertains conscientious opinions against imposition of the death penalty, that is a ground of challenge by the state. We adhere to that rule. The objection that the district attorney, in examining jurors on the voir dire, asked them whether they had "moral or conscientious scruples," instead of "conscientious opinions," against the death penalty, seems to us to lack substance. These assignments are without merit.

■ There are no other assignments of error. We find no reversible error in the record. The trial was a model of fairness both on the part of the presiding judge and of counsel representing the state. The crime charged was conclusively proved, and the jury in the end were no doubt concerned only with the question whether the insanity defense had been established. They determined that issue adversely to the defendant and that he should pay the extreme penalty for his act. Fully conscious of the responsibility resting upon us in a case of this gravity, we have no alternative other than to affirm the judgment.