Argued and submitted April 27, affirmed July 6, reconsideration denied August 26, petition for review allowed September 27, 1983 (295 Or 730)
See 296 Or 377, 677 P2d 678 (1984)

# STATE OF OREGON,
*Respondent,*

*v.*

# LARRY LEE LERCH,
*Appellant.*

## (C81-09-34281; CA A24731)

666 P2d 840

Stephen A. Houze, Portland, argued the cause and filed the brief for appellant.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Defendant appeals his conviction for intentional murder, assigning as errors (1) denial of his motion to suppress evidence seized during a warrantless search of his apartment; (2) denial of his motion to suppress statements to police; (3) admission of a photograph of him; (4) admission of certain lay opinion testimony; (5) admission of hair comparison testimony; (6) denial of his requested jury instruction; and (7) denial of his motions for judgment of acquittal and directed verdict.

On Monday, July 27, 1981, seven-year-old Michael Hanset disappeared from his home near Colonel Summers Park in Portland. Sandra Hanset, Michael's mother, testified that she last saw Michael between 5 and 6 p.m. and that he was going to a nearby friend's house to play. When Michael failed to return, the Hansets began searching the neighborhood for him and contacted the police later that evening. The police began an extensive search, including public appeals over the next several days.

On Wednesday, July 29, 1981, defendant, who lived in an apartment near the park, told his sister that he had seen a small foot sticking out of a canvas laundry bag[1] in a dumpster near a fish market after the boy's disappearance. On Friday, July 31, 1981, defendant told another sister and her husband a similar story. That day, defendant's family contacted the police with this information. Because defendant was an escapee from the Oregon State Penitentiary, police arrested him at his apartment on escape charges at 5 p.m. on Friday, July 31. He was taken to the Portland police station and placed in a holding cell.

At approximately 7 p.m. on that night, defendant was interviewed by Detectives Taylor and Newberg. He was read his *Miranda* rights and waived them. He signed a *Miranda* waiver form and also a form consenting to a search of his apartment. During the interview, which lasted until approximately 11 p.m., defendant stated that he had seen Michael in the park on July 27, that Michael had been collecting empty bottles to return for deposit, that defendant had given Michael

---

[1] Defendant also told his sisters that he knew the laundry bag containing the body belonged to him.

some change and that he had not seen Michael again. He also told the detectives about seeing a foot sticking out of a laundry bag in a dumpster after Michael's disappearance. During the interview, defendant consented to take a polygraph examination the following morning. Only the last 30 minutes of the interview were recorded.

Following that interview, Detectives Taylor and Newberg contacted Officer Hinckley and Sergeant Matsuda of the Crime Detection Laboratory of the State Police, and the four of them conducted a search and crime scene processing of defendant's apartment at 1 a.m. on August 1.[2] Several stains on the kitchen floor were tested for blood with negative results. Vacuum sweepings were taken from the living room and kitchen floors.

At 8:30 a.m. on August 1, 1981, defendant was interviewed by Detective Bell, the polygraph examiner, and again informed of his *Miranda* rights. After signing a *Miranda* waiver form, defendant was given a polygraph examination concerning the missing child. Following that examination, Detective Bell told defendant that he knew he was not being truthful about the boy and urged defendant to tell him the truth. Defendant then confessed, stating that he had taken Michael to his apartment at around noon on July 27 to give him some empty bottles and that, because defendant had taken "acid" (LSD) earlier, he took a quantity of "valium 5's" on reaching the apartment "to come down more." Defendant stated that the next thing he remembers is that his hand was around the child's throat and that the child was dead. Defendant stated that he put the child on the living room floor and was unable to "function" until around 5 a.m. on the following morning. Defendant stated that at that time he put the child's body in a laundry bag, tied it shut with a rawhide string and carried it to the dumpster next to the fish market, where he disposed of it.

At 1 p.m., defendant was interviewed again by Detectives Taylor and Newberg. He was read his *Miranda* rights and

---

[2] Police conducted two other searches based on defendant's consent, but the trial court suppressed items seized in those searches after concluding that defendant's circumstances had changed sufficiently to revoke his consent and require the police to obtain a search warrant.

signed another *Miranda* waiver at that time. Defendant repeated his confession. The entire interview was recorded.

The contents of the dumpster identified by defendant as containing the boy's body had been picked up on Thursday, July 30, and taken to a landfill. An extensive and detailed search of the landfill was begun by police and landfill employes on August 4, 1981, and continued through August 10. The child's body was not found.

Defendant first assigns error to the warrantless search of his apartment based on his consent. He contends that his consent was involuntary, that, even if consent was voluntary, the search exceeded the scope of his consent and that items seized were not properly discoverable under the "plain view" exception to the warrant requirement.

■ In determining the validity of a consent search, the totality of the facts and circumstances must be examined to see whether defendant's consent was given by his free will or rather was the result of either express or implied coercion. *Schneckloth v. Bustamonte,* 412 US 218, 226-27, 93 S Ct 2041, 36 L Ed 2d 854 (1973); *State v. Kennedy,* 290 Or 493, 502, 624 P2d 99 (1981). Defendant argues that his consent was coerced on the basis of the following factors: (1) he was subjected to custodial interrogation ultimately lasting four hours; (2) he has a low intelligence, having dropped out of school after failing the 10th grade; (3) he was without food or rest; (4) he had consumed large quantities of drugs and alcohol during the preceding week, which impaired his mental faculties; and (5) Detectives Taylor and Newberg deceived him into believing that they would search his apartment only for property or belongings of the missing child.

■ Lawful custody does not render an otherwise voluntary consent involuntary but rather is simply a relevant factor to be considered in the totality of the circumstances. *State v. Quinn,* 290 Or 383, 394, 623 P2d 630 (1981). Here defendant's arrest on escape charges was lawful, he was given repeated *Miranda* warnings and was specifically advised that he need not consent to the search but could require the officers to secure a warrant. Although the entire custodial interrogation lasted four hours, defendant consented to the search of his apartment within the first hour of the interview. During the last half hour, in which the interview was recorded, defendant

acknowledged that his consent to the search was of his own free will. Detective Newberg's unrebutted testimony was that defendant was given liquid refreshment at the beginning of the interview and was permitted cigarette breaks. During the recorded interview, defendant did not appear confused or intoxicated and stated that he "sobered up" that morning. Additionally, even assuming defendant has a "low" intelligence,[3] he has had prior contacts with police, which should have given him a reasonable appreciation of the consequences of his actions. Finally, for the reasons stated below, defendant was not deceived as to the scope of the search to be conducted by the detectives. We find no evidence in the record to suggest that defendant's will was overborn.

■ Neither are we persuaded that the scope of the search exceeded defendant's consent. When police rely on consent as a basis for a search, they have no more authority to search than they are given by the consent. Thus, a consent to search may be confined in scope to specified items, restricted to certain areas or limited in purpose or time. *United States v. Dichiarinte,* 445 F2d 126 (7th Cir 1971).

■ Defendant contends that he consented to a search of his apartment only for belongings or clothing of the missing child and that the items ultimately seized, vacuum sweepings, were beyond the scope of consent. The consent form signed by defendant, however, provided in part:

"* * * * *

"(2) If you consent to a search, *anything of value as evidence seized* in the course of the search can be used in court against you.

"* * * * *

"I hereby authorize these officers *to seize any article which they consider to be of value as evidence.*

"* * * * *" (Emphasis supplied.)

Additionally, during the recorded interview, defendant was asked if he consented to "checking your apartment for any evidence or belongings or property that might have to do with this case concerning Michael Hanset." Defendant

---

[3] Defendant offers no evidence for this inference except his failure to complete high school. That factor is not necessarily indicative of "low" intelligence.

agreed. There is simply no evidence that he limited his consent to specific items of clothing or belongings of the child.

Defendant next argues that the search exceeded the scope of consent, because the consent form he signed authorized only Detectives Taylor and Newberg to search and not additional personnel from the state crime lab. The form completed by Taylor and signed by defendant lists Taylor and Newberg as police officers authorized to search. Although a space is provided for listing persons outside the police bureau authorized to search, Taylor drew a line through that space. As noted earlier, the search of defendant's apartment on August 1 was performed by two employes of the state crime lab as well as by the detectives designated on the consent form. Whether Taylor's failure to include on the consent form all persons who would participate in the search confined defendant's consent to a search conducted only by Taylor and Newberg depends on an examination of the circumstances surrounding the consent to determine the terms of the agreement.

■ Before defendant's consent was obtained, he was advised that he need not consent and that he could require that a search warrant be obtained prior to any search. Further, defendant's consent was general and unqualified; the officers were authorized to seize anything considered to be of value as evidence, including vacuum sweepings. There is no evidence other than the form agreement that defendant restricted his consent to a search by only Taylor and Newberg, nor do we conclude that the consent agreement can be construed to reach that effect. Although the agreement provides that certain officers are authorized to search the premises, it does not prohibit those officers, either expressly or by implication, from requesting assistance in the search. We conclude that defendant waived any reasonable expectation of privacy in his apartment including any limitation on the authority of the detectives to request assistance in the search.

■■ Defendant next argues that the articles seized (vacuum sweepings) were not within the "plain view" exception to the warrant requirement. That doctrine is applicable in a consent search only when officers, legitimately on the premises pursuant to a consent, discover not only objects sought but also incriminating evidence of other crimes in plain view. 2 LaFave, Search and Seizure 589, § 7.5 (1978). Here the articles

seized were within the parameters of the consent search, and the plain view doctrine is inapplicable.

In his second and third assignments of error, defendant contends that statements made to Detective Bell during and after the polygraph examination on August 1 and statements made to Taylor and Newberg on the afternoon of August 1 were involuntary and should be suppressed.[4] Defendant cites the following factors as weighing against the voluntariness of those two confessions: he had been "virtually" without sleep for 24 hours, had been in custody 15 hours and subjected to four hours of "intense questioning", and was subjected to a polygraph examination and then induced into making inculpatory statements by Bell's assertion that he was lying, and his mental state was impaired as evidenced by his confusion as to the dates and times.

 The state has the burden of proving that defendant's confession was freely and voluntarily made. *State v. Mendacino,* 288 Or 231, 235, 603 P2d 1376 (1979). In reviewing the voluntariness of a confession, we are bound by the historical facts found by the trial court, although we are not bound by the court's conclusion of involuntariness, if we determine that those historical facts are not sufficient to meet the constitutional standards. *Ball v. Gladden,* 250 Or 485, 487-88, 443 P2d 621 (1968). Voluntariness is determined by the totality of the circumstances. *Frazier v. Cupp,* 394 US 731, 739, 89 S Ct 1420, 22 L Ed 2d 684 (1969); *State v. Burdick,* 57 Or App 601, 606, 646 P2d 91 (1982). Here the trial court found that defendant agreed in writing to undergo a polygraph examination, that prior to that examination he was advised of his *Miranda* rights and acknowledged and waived them in writing, that before the interview with Taylor and Newberg defendant was again advised of his *Miranda* rights and again waived those rights in writing; that the interviews were conducted in clean, well-lighted custodial facilities; that no threats or promises were made to defendant; and that defendant was not deprived of food, drink or sleep.

---

[4] Defendant also argues that these statements were tainted by the prior illegal search of defendant's apartment on August 1. Because we have concluded that that search was lawful, that argument is rejected.

■ We conclude that the evidence supports those findings and that defendant's confessions to Bell and later to Taylor and Newberg were voluntary. There is no indication that the police employed coercive tactics during any of defendant's three interviews. Defendant slept following the July 31 interview, which ended at approximately 11 p.m., and was given breakfast before being taken to the polygraph examination at 8:30 a.m. on August 1. Defendant was repeatedly advised of his *Miranda* rights and repeatedly waived them, both orally and in writing. Similarly, Bell's statement to defendant following the polygraph that defendant was not being truthful does not render his subsequent confession involuntary. Use of a polygraph by police in interrogating suspects has been approved, provided the examination was submitted to voluntarily. *State v. Clifton,* 271 Or 177, 181, 531 P2d 256 (1975). There is no question but that defendant freely and voluntarily submitted to the examination. Finally, although defendant was uncertain about the times and dates of the events surrounding the crime, he stated that his confusion was due to ingestion of large quantities of drugs and alcohol during that time. There is no evidence that defendant was under the influence of either of those substances during the interview. *See State v. Corona,* 60 Or App 500, 506, 655 P2d 216 (1982).

Next defendant contends that the trial court committed reversible error when it allowed the state to introduce into evidence a photograph of him nude from the waist up for the purpose of showing that defendant had sufficient strength to strangle the victim. Defendant alleges that the photograph has little probative value and is highly prejudicial, because extensive tatooing on defendant's arms is visible. Defendant also argues that his strength could have been shown in a number of other less prejudicial ways, such as testimony by witnesses familiar with defendant's musculature.

■ OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

The admission of relevant but potentially prejudicial evidence is within the discretion of the trial court. *Carter v. Moberly,* 263 Or 193, 200, 501 P2d 1276 (1972).

In defendant's confession to Taylor and Newberg, he stated that he held the child in mid-air with his left hand (defendant is right-handed) around the child's throat for approximately thirty minutes. Given that description of the strangulation, we cannot say that the trial court abused its discretion in admitting a photograph depicting defendant's musculature. Although the photograph may have had only marginal relevance in proving that defendant was physically capable of strangling a child as he described, it was more probative to corroborate defendant's confession of the bizarre manner in which the strangulation occurred. Similarly, although other evidence was available to prove defendant's strength, the state has the burden of establishing guilt beyond a reasonable doubt and thus has the right to prove every essential element of the crime in the most convincing manner. *State v. Jensen,* 209 Or 239, 280, 289 P2d 687, 296 P2d 618 (1956), *appeal dismissed* 352 US 948 (1957).

Defendant next contests the admission of opinion testimony by Detective Taylor that a stain observed on defendant's kitchen floor was fecal material.[5] As foundation for his testimony, Taylor stated that he had been a uniformed officer for seven and one-half years and during that time he often observed fecal material in public streets, buildings and patrol cars. He also stated that as a homicide detective he had observed that some victims defecate when being strangled.

OEC 701 provides:

"If the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are:

"(1) Rationally based on the perception of the witness; and

"(2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

Whether a lay witness is qualified to testify as to any matter of opinion is a preliminary determination within the sound discretion of the trial judge. The admission or rejection of such

---

[5] In his confession to Taylor and Newberg on August 1, defendant stated that the child was strangled in the kitchen.

testimony will not be reversed, unless it is shown to be a clear abuse of judicial discretion. *Fidelity Sec. Corp. v. Brugman et al.*, 137 Or 38, 46, 1 P2d 131, (1931); *Hwy. Comm. v. Ore.-Wash. Lbr. Co.*, 24 Or App 187, 191, 544 P2d 1058, *rev den* (1976).

Defendant contends that Taylor's testimony was not rationally based, because observation of a reddish brown stain on a kitchen floor permits several possible inferences as to the origin of the stain. Additionally, defendant argues that Taylor's testimony was unnecessary, because he could have conveyed his sense impression of the stain without giving his opinion and, further, that a photograph of the stain admitted at trial accurately reproduced the matter for the trier of fact.

[redacted] Opinion testimony is admissible when the data the witness has observed cannot be adequately reproduced in such a manner as to enable the jury to form an opinion or reach an intelligent conclusion. Thus,

> "* * * [i]f the jury can be put into a position of equal vantage with the witness for drawing the opinion, then the witness may not give an opinion. Because it is sometimes difficult to describe the mental or physical condition of a person, his character or reputation, the emotions manifest by his acts; speed of a moving object or other things that arise in a day to day observation of lay witnesses; things that are of common occurrence and observation, such as size, heights, odors, flavors, color, heat, and so on; witnesses may relate their opinions or conclusions of what they observed." *United States v. Skeet*, 665 F2d 983, 985 (9th Cir 1982).

[redacted] Taylor's statement was admissible opinion testimony, because it concerned data difficult to reproduce for a jury: first-hand observation of a particular stain on a dirty kitchen floor. Taylor's opinion as to the origin of the stain was rationally based on his work experience and helpful in determination of a fact in issue, that is, whether the child was strangled in defendant's apartment. Contrary to defendant's assertion, the photograph admitted at trial was not an accurate reproduction of what Taylor directly experienced. The photograph was of poor quality and depicted a shadowy portion of a dirty floor with a light shining on a particular stain. The photograph simply aided the factfinder in weighing Taylor's opinion. Similarly, defendant's concerns about the validity of Taylor's conclusion that the stain originated from fecal matter goes to the weight of his testimony and not its admissibility.

Defendant also assigns error to the admission of opinion testimony that an odor emanating from the dumpster where defendant confessed to disposing of the child's body was that of decomposing human flesh. Jaha, owner of the fish market next to the dumpster in question, testified that, during military service in the Korean War from 1951 to 1952, he observed dead human bodies and smelled the odor of decomposing human flesh. Jaha then testified that on the afternoon of Wednesday, July 29, 1981, he smelled the odor of decomposing human flesh coming from the dumpster next to his fish market.

■ Defendant claims that Jaha's testimony had no rational basis, because the odor of decomposing human flesh experienced over 30 years ago cannot be distinguished from the odor of rotting fish parts discarded by Jaha in the dumpster. Additionally, defendant cites various factors affecting the validity of Jaha's opinion[6] and argues that, because of its doubtful credibility, the probative value of the testimony is outweighed by its prejudicial impact on defendant. Again, defendant's concerns go to the weight of the testimony but not its admissibility. Jaha's testimony was rationally based on his perception (he knew the odor of decomposing human flesh) and helpful to a determination of a fact in issue (whether defendant disposed of the child's body in the dumpster). Jaha was thoroughly cross-examined, and the extent of his capacity to detect a particular odor in the dumpster was fully disclosed. His testimony was relevant, and its probative value outweighed any prejudicial effect on defendant.

Defendant next assigns error to the admission of hair comparison evidence. Officer Hinckley, a criminalist for the Oregon State Police, testified that three hairs found in the carpet of defendant's apartment were "microscopically indistinguishable" from hairs found on the missing child's jacket and were possibly from the same source. Hinckley also testified, however, that the hairs contained insufficient unique

---

[6] The factors defendant sets forth as affecting Jaha's testimony include his inconsistent testimony, that Jaha did not examine the dumpster after smelling the odor of decomposing human flesh, that he failed to notify anyone of his perception, that his perception was inconsistent with the probable decaying process of the body according to certain expert witnesses, that the odor of the body would have been masked by the odor of rotting fish parts and that it is improbable that Jaha would identify an odor he had not sensed in 30 years.

characteristics to allow a more conclusive opinion. Defendant challenges the probative value of this evidence, because none of the hairs were positively identified as belonging to the child.

The probative value of hair comparison evidence that "tended to prove no more than that there was a possibility that the hair was from the defendant" was recently considered in *State v. Kersting,* 292 Or 350, 354, 638 P2d 1145 (1982). Quoting from *State v. Harris,* 241 Or 224, 243, 405 P2d 492 (1965), where, as here, the state's witness could not positively identify hair as being that of the victim, the court applied the following principle to hair comparison evidence:

> "* * * The requirement that the guilt of the defendant be proved beyond a reasonable doubt does not prevent the admissibility of evidence that does no more than prove possibility or probability. * * *"

Applying the principle here, we conclude that the evidence had sufficient probative value to be admissible. Hinckley readily conceded that the identification of the hairs examined could not be positive. Defense counsel cross-examined Hinckley about the lack of precision inherent in this type of evidence, and the strengths and weaknesses of the microscopic examination were brought to the jury's attention. The jury had adequate opportunity to determine what weight to assign Hinckley's testimony. The evidence was not inadmissible simply because it was less than certain. *See United States v. Oaxaca,* 569 F2d 518, 526 (9th Cir), *cert den* 439 US 926 (1978).

Defendant next challenges the trial court's refusal to give the following requested jury instruction:

> "A person must be missing for seven years before he will be presumed to be dead."

Defendant argues that, because his theory at trial was that the child could possibly be alive, he was entitled to have the jury instructed as to how the law views the disappearance of a person. Defendant's requested instruction, however, was not a correct statement of the law. Rather, OEC 311(1)(s) provides that the following is presumed:

> "A person not heard from in seven years is dead."

That statute does not require, as defendant's instruction would, that a person may *not* be presumed dead unless missing for seven years, but only that such a presumption is

permissible if a person has not been *heard from* in seven years. The trial court did not err in refusing to give the requested instruction.

Finally, defendant assigns error to the denial of his motions for judgment of acquittal and directed verdict, contending that there was insufficient evidence of *corpus delecti* independent of defendant's confessions. ORS 136.425(1) provides, in material part:

> "* * * nor is a confession only sufficient to warrant his conviction without some other proof that the crime has been committed."

In *State of Oregon v. Watts*, 208 Or 407, 409, 301 P2d 1035 (1956), the Supreme Court interpreted this statute to require

> "* * * that the *corpus delicti* be proven *aliunde* the confession; that is, the evidence must show the commission of the crime independent of the declarations of the accused. * * * It is, therefore, clear that, while the confession may be used to show who perpetrated the crime, it must first be legally shown that a crime was committed."

The *corpus delicti* in a homicide consists of two elements: (1) that a death has occurred and (2) that the death resulted from criminal agency other than suicide. *State v. Henderson*, 182 Or 147, 190, 184 P2d 392, 186 P2d 519 (1947). The *corpus delicti* may be established by direct or circumstantial evidence. *State of Oregon v. Watts, supra.*

Defendant argues that, under *Watts*, where circumstantial evidence is relied on to establish *corpus delicti*, it must be proven by "clear, unequivocal, cogent and convincing [evidence]." In *State v. Smith*, 31 Or App 321, 324-25, 570 P2d 409 (1977), however, we stated that the traditional rule of circumstantial evidence set forth in *Watts* has been "largely repudiated" by the Supreme Court in *State v. Krummacher*, 269 Or 125, 523 P2d 1009 (1974), where the court concluded that circumstantial evidence, like direct evidence, must indicate guilt to the extent that there is no reasonable doubt of the conclusion.[7] We concluded in *Smith* that the *Krummacher* analysis should apply to the quality of proof necessary for a *corpus delicti*, because "to require more from circumstantial evidence

---

[7] *But see State v. Swearengin*, 32 Or App 349, 573 P2d 778 (1978).

to establish the *corpus delicti* than is required to establish guilt beyond a reasonable doubt" would be inconsistent. *State v. Smith, supra,* 31 Or App at 325.

The evidence of *corpus delicti,* independent of defendant's confessions, was circumstantial. There was evidence that hairs taken from the carpet in defendant's apartment were "microscopically indistinguishable" from hairs found on the child's jacket and could have been from a common source. There was evidence that Detective Taylor observed a reddish brown stain on the kitchen floor, which he believed to be fecal matter. Taylor and Dr. William Brady, the state medical examiner, testified that defecation by victims of strangulation was common. There was evidence that Jaha smelled an odor of decomposing human flesh coming from the dumpster near his fish market on the afternoon of July 29, 1981. Finally, there was evidence that defendant was seen with the missing child on the afternoon of July 27, 1981, and that the child has been missing since that date.

We conclude that the circumstantial evidence was sufficient to permit a jury to find beyond a reasonable doubt that a homicide had been committed. In so concluding, we agree with defendant that the circumstantial evidence would not satisfy the *Watts* standard of clear, unequivocal, cogent and convincing evidence; however, as we noted earlier, that standard is no longer required to be satisfied.

Affirmed.